**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gerald BLACK, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Stephen R. DAVIS, Defendant–Appellant.**

**Nos. 96–3890, 97–1144.**

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1997.

Decided Sept. 3, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 96–3890 Nov. 13, 1997.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee in No. 96–3890.

Clark W. Holesinger, Portage, IN, for Defendant–Appellant in No. 96–3890.

Judith A. Stewart, Mark D. Stuaan (argued), Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee in No. 97–1144.

Steven J. Riggs, Indiana Federal Community Defenders, Inc. Indianapolis, IN, for Defendant–Appellant in No. 97–1144.

Before POSNER, Chief Judge, BAUER, and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

Gerald Black and Stephen R. Davis were each convicted of one count of willfully failing to pay a past due support obligation, in violation of the Child Support Recovery Act ("the CSRA"), 18 U.S.C. § 228. Their appeals were consolidated. On appeal, Black contends that the CSRA is an unconstitutional exercise of Congress' power to regulate interstate commerce under the Commerce Clause and an unconstitutional intervention into matters reserved for the States under the Tenth Amendment. Black also argues that a state-court arrearage order determining past due child support is required for a finding of guilt under the CSRA. Davis offers the same arguments. In addition, along with a host of other contentions, Davis contends that the CSRA is unconstitutional as applied to him in particular. We hold that the CSRA is constitutional, and we affirm as to all other issues raised on appeal.

### Background

A. *Gerald Black*

Gerald Black ("Black") and Elaine Black were divorced in 1985 in Lake County,

Indiana Circuit Court. Black was originally given custody of the couple's three children, Ernest, Eric, and Elizabeth. However, in 1986, the custody decree was modified, wherein Elaine Black was given custody and Black was ordered to pay seventy-five dollars per week in child support. Black kept the family home in Hammond, Indiana. Elaine Black moved to Illinois, where she received welfare in 1986 and 1987. She assigned her support rights to the State of Illinois. Elaine Black then moved back to Indiana in 1988.

On August 27, 1990, the Lake County Circuit Court ordered Black to pay $150 per week in child support. On August 27, 1991, the court entered an order showing that Black was $5,787.50 in arrears in his child support payments. Black made no payments towards that arrearage. He also never sought a modification of the court's earlier support order. On January 10, 1992, Black sold his Hammond home for $58,000. He quit his job of twenty-three years on May 9, 1992. He stopped making child support payments altogether in June 1992.

In February 1993, Black moved back to his hometown in Michigan and bought a farm. Some time later he married Pamela Black. Ernest Black moved out of Elaine Black's home in August 1993. Eric Black joined the Air Force in January 1995 and moved out in August of that same year.

On December 21, 1994, the United States Attorney for the Northern District of Indiana filed an information charging that Black, residing in a state different from his children, willfully and unlawfully failed to pay a due support obligation; that Black failed to pay this obligation for over one year; and that Black's obligation exceeded $5,000, all in violation of the Child Support Recovery Act, 28 U.S.C. § 228. On November 22, 1995, the U.S. Attorney's Office filed a superseding indictment, indicating that the amount Black owed was at least $17,274. On November 27, 1995, Black filed a motion to dismiss the information, contending that the CSRA exceeded Congress' powers under the Commerce Clause and was a violation of the Tenth Amendment. That motion was denied.

On March 5, 1996, after a bench trial before a magistrate judge, Black was found guilty and sentenced to six months' imprisonment. The court suspended the sentence and put Black on probation for eighteen months. Black was ordered to pay the U.S. Attorney's Office $16,565 in restitution by September 5, 1996, and $500 per month thereafter until the total amount he owed was fully satisfied. Black appealed and the district court affirmed. Black now appeals the district court's judgment.

## B. *Stephen R. Davis*

Stephen R. Davis ("Davis") and Barbara L. Davis divorced in May 1985 in Indianapolis, Indiana. As part of the divorce decree, the couple entered into a written agreement, which, among other things, detailed Davis' duty to make child support payments. Under the agreement, Davis was required to pay $300 per week in child support ($150 for each of their children, James and John). When the oldest child reached the age of twenty-one, Davis' obligation would be reduced to $150 per week for the younger son. In 1985 and 1986, contempt proceedings were brought against Davis in Marion County, Indiana. On September 18, 1987, Davis and Barbara Davis signed an "Agreed Entry," indicating that Davis was in arrears in his child support payments.

In the meantime, Davis moved to Texas in late 1985 or early 1986. He apparently told Barbara Davis that he moved to Texas because he believed that his Indiana support obligation would not be enforced there. Barbara Davis asked Marion County court officials to pursue Davis in Texas. Barbara's case was filed on July 16, 1992, in Family District Court, Dallas County, Texas, but was dismissed for want of prosecution on October 5, 1993. Davis made periodic payments which ended in August 1992. As of October 1995, Davis was approximately $111,800 in arrears in child support payments.

On December 22, 1995, Davis was charged by information in Indiana District Court with one count of violating 18 U.S.C. § 228. On September 25, 1996, after a bench trial, Davis was found guilty and was sentenced to six months' imprisonment, to be followed by a one-year term of supervised release. He

was ordered to make restitution in the amount of $111,800. He now appeals that judgment.

On appeal, Black claims that the CSRA is unconstitutional because: it is not within Congress' power to regulate commerce because the Act contains no substantial interstate link; being a criminal statute, it has no substantial relation to interstate commerce; it intervenes into family law matters reserved for the States and therefore violates the principles of federalism and comity; and it violates the Tenth Amendment. Davis, too, claims that the CSRA is an unconstitutional exercise of Commerce Clause power, both on its face and as applied to him. Davis also claims that the CSRA, as applied to him, is a violation of the Ex Post Facto Clause and that the district court committed constitutional error in refusing to hear his theory of defense. Davis argues that the information filed against him should have been dismissed because it failed to state an offense cognizable under the CSRA. Davis also believes that the district court should have abstained from asserting and exercising federal jurisdiction. Finally, he claims that the Government failed to prove beyond a reasonable doubt that he willfully failed to pay child support. In addition, both men believe that a state court arrearage order is required before a finding of guilt under the CSRA. None of the grounds asserted by Black or Davis affords them relief.

## Analysis

### A. *The Constitutionality of the CSRA*

■ We review the district court's determination as to the constitutionality of a federal statute *de novo*. *United States v. Wilson*, 73 F.3d 675, 678 (7th Cir.1995). Black and Davis raise a number of constitutional concerns, first and foremost, that Congress has overstepped its Commerce Clause power in enacting the CSRA, which punishes the "willful[ ] fail[ure] to pay a past due child support obligation with respect to a child who resides in another State." 18 U.S.C. § 228(a). "Past due child support" refers to "any amount—(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and (B) that has remained unpaid for a period of one year, or is greater than $5,000...." 18 U.S.C. § 228(d)(1).

Congress has expressly recognized that collecting past due child support obligations from out-of-state deadbeat parents has outgrown state enforcement mechanisms. In a report to accompany H.R. 1241 (the bill that would become the CSRA), the House of Representatives' Committee on the Judiciary noted that in 1989, $16.3 billion in child support payments were due, but only $11.2 billion were made. H.R.REP. No. 102–771, at 7 (1992). The Committee expressed concern that this deficit continues to average $5 billion annually. *Id.* It also found that statistics suggest that delinquent parents' chances for successfully avoiding support payments increase markedly when they cross state lines. *Id.*

At least forty-two states have made willful failure to pay child support a crime, punishable in some states by imprisonment for up to ten years, but the Committee noted that the ability of those states to enforce such laws outside their own boundaries is severely frustrated. Although most states have adopted the Uniform Reciprocal Enforcement of Support Act (URESA), which includes provisions that provide for the extradition of interstate child support defendants and the processing of requests for enforcement of support orders, the Committee concluded that "interstate extradition and enforcement in fact remains a tedious, cumbersome and slow method of collection." *Id.* at 7–8. On the day of the CSRA's passage in the House of Representatives, Congressman Charles Schumer stated:

> The need for this legislation is clear.... Many of our States have done their best.... *But the ability of those States to enforce such laws outside their own boundaries is hobbled by a labyrinth of extradition laws and snarls of red tape.* As a result, skipping out on child support is one of the easiest crimes to get away with in America today.

138 Cong. Rec. H7324–01 (daily ed. August 4, 1992) (emphasis added). With all of the above concerns in mind, Congress passed the CSRA on October 25, 1992. Challenges to the Act's constitutionality ensued.

Whether the CSRA is constitutional is an issue of first impression in this Circuit. At the outset of our discussion, we note that every circuit court that has addressed the issue has found the CSRA to be constitutional. *See United States v. Crawford*, 115 F.3d 1397, 1401 (8th Cir.1997); *United States v. Bailey*, 115 F.3d 1222, 1227 (5th Cir.1997); *United States v. Johnson*, 114 F.3d 476, 479–81 (4th Cir.1997); *United States v. Parker*, 108 F.3d 28, 29–31 (3d Cir.1997); *United States v. Bongiorno*, 106 F.3d 1027, 1030–33 (1st Cir.1997); *United States v. Hampshire*, 95 F.3d 999, 1001–04 (10th Cir.1996), *cert. denied*, ―― U.S. ――, 117 S.Ct. 753, 136 L.Ed.2d 690 (1997); *United States v. Mussari*, 95 F.3d 787, 790–91 (9th Cir.1996), *cert. denied*, ―― U.S. ――, 117 S.Ct. 1567, 137 L.Ed.2d 712 (1997); *United States v. Sage*, 92 F.3d 101, 104–07 (2d Cir.1996), *cert. denied*, ―― U.S. ――, 117 S.Ct. 784, 136 L.Ed.2d 727 (1997). Today, we follow their lead.

### 1. *Commerce Clause authority*

The Commerce Clause confers a plenary power upon Congress to "regulate Commerce ... among the several States...." U.S. Const. art. I, § 8, cl. 3. "The motive and purpose of a regulation of interstate commerce are matters for the legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control." *United States v. Darby*, 312 U.S. 100, 115, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941). Congress' power under the Commerce Clause "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824). Thus, judicial review in this area is limited and deferential. We need only ask "whether Congress could have had a rational basis to support the exercise of its commerce power" and whether "the regulatory means chosen were 'reasonably adapted to the end permit-

ted by the Constitution.'" *United States v. Kenney*, 91 F.3d 884, 886 (7th Cir.1996) (citing *Hodel v. Virginia Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360 (1981)). This does not mean that a court will inevitably rubber stamp all congressional statutes. It is still the province of the courts to determine whether Congress has exceeded its enumerated powers. *See id.* (citing *Wilson*, 73 F.3d at 680); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

The power granted Congress by the Commerce Clause has attained a rather wide scope in the years since *Gibbons v. Ogden*. Many of the post-*Gibbons* cases have upheld Congress' regulation of materials, which, at first blush, would not strike most as "commerce" in any technical commercial sense of the word. *See United States v. Bongiorno*, 106 F.3d 1027, 1031 (1st Cir.1997) (concluding that "[t]he term 'commerce' in the Commerce Clause context is a term of art, and the Court consistently has interpreted it to include transactions that might strike a lay person as "noncommercial" "); *see also United States v. Simpson*, 252 U.S. 465, 466, 40 S.Ct. 364, 364, 64 L.Ed. 665 (1920) (finding that transporting whiskey intended for the transporter's personal consumption constituted "commerce"); *Lottery Case (Champion v. Ames)*, 188 U.S. 321, 354, 23 S.Ct. 321, 326, 47 L.Ed. 492 (1903) (concluding that "commerce" included carrying lottery tickets).

The Supreme Court has also stated that Congress' Commerce Clause power "is a positive power ... to govern affairs which the individual states, with their limited territorial jurisdictions, are not fully capable of governing." *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 552, 64 S.Ct. 1162, 1173, 88 L.Ed. 1440 (1944). Congress has often used this positive power to pass laws that "help the States solve problems that defy local solutions." *United States v. Sage*, 92 F.3d 101, 105 (2d Cir.1996) (collecting cases), *cert. denied*, ―― U.S. ――, 117 S.Ct. 784, 136 L.Ed.2d 727 (1997). Because they impose criminal sanctions, these statutes might not, at first glance, appear to be regulations of "commerce" *per se*. For example, in *Perez v. United States*, 402 U.S.

146, 150, 91 S.Ct. 1357, 1359–60, 28 L.Ed.2d 686 (1971), the legislative history of the Consumer Credit Protection Act, 18 U.S.C. § 891 *et seq.*, evidenced that Congress did not believe that the States alone could foil loansharking. In *United States v. Sheridan*, 329 U.S. 379, 384, 67 S.Ct. 332, 334–35, 91 L.Ed. 359 (1946), the legislative history of the National Stolen Property Act, 18 U.S.C. § 2314, indicated that Congress wanted to help the States "in detecting and punishing criminals" who "make a successful getaway and thus make the state's detecting and punitive processes impotent."

█ Recently, the Supreme Court concluded that there are three broad areas of activity that Congress may regulate under its commerce power. *United States v. Lopez*, 514 U.S. 549, 558, 115 S.Ct. 1624, 1629, 131 L.Ed.2d 626 (1995) (citing *Perez*, 402 U.S. at 150, 91 S.Ct. at 1359). First, Congress may oversee the use of the channels of interstate commerce. *Id.* (citations omitted). Second, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though any threat to them may only emanate from intrastate activities. *Id.* (citations omitted). Finally, Congress has the power to regulate those activities which substantially affect interstate commerce. *Id.* (citations omitted).

Black and Davis rely heavily on *Lopez*. Black maintains that the CSRA lacks a jurisdictional nexus to interstate commerce. More specifically, he argues that the CSRA does not fall into any of the three permissible areas discussed in *Lopez* because the failure to pay child support: (1) is not a misuse of the channels of interstate commerce; (2) does not put the instrumentalities of interstate commerce at risk; and (3) does not "substantially affect" interstate commerce. Davis primarily argues that those circuits that have found that the CSRA is constitutional under the second prong of *Lopez* have stretched Supreme Court jurisprudence in order to find a way to uphold the CSRA. We disagree.

The CSRA is a facially valid exercise of congressional power under the Commerce Clause. It regulates the nonpayment of interstate child support obligations. Thus, at the very least, the CSRA regulates a "thing" in interstate commerce and therefore falls within the second category of *Lopez*.[1] In *United States v. Sage*, the Second Circuit concluded that child support orders which obligate one parent in one state to make payments to another parent in another state are functionally equivalent to interstate contracts. 92 F.3d 101, 105 (2d Cir.1996); *see also United States v. Bongiorno*, 106 F.3d 1027, 1032 (1st Cir.1997). Quite simply, "[t]he Act presupposes intercourse, an obligation to pay money, and the intercourse concerns more states than one." *Sage*, 92 F.3d at 105. Payments stemming from a support obligation will usually travel in interstate commerce by mail, wire, or electronic transfer. *United States v. Parker*, 108 F.3d 28, 31 (3d Cir.1997). That a support obligation is an intangible and that payments under it may only amount to a transfer of electrons across state lines is immaterial. *See United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 549–50, 64 S.Ct. 1162, 1171–72, 88 L.Ed. 1440 (1944); *Bongiorno*, 106 F.3d at 1031.

Other circuits have characterized the CSRA as a constitutional regulation of the nonpayment of debts in which the judgment creditor and judgment debtor live in different states. *See United States v. Hampshire*, 95 F.3d 999, 1003–04 (10th Cir.1996); *United States v. Mussari*, 95 F.3d 787, 790 (9th Cir.1996); *see also Bongiorno*, 106 F.3d at 1032. Satisfaction of a support obligation may be frustrated by the debtors' intentional failure to pay. *Mussari*, 95 F.3d at 790. Black criticizes the CSRA for being nothing more than a criminal statute having no substantial relation to interstate commerce. However, a parent's intentional failure to pay child support constitutes a conscious impediment to interstate commerce that Congress can criminalize just as it has other impediments to interstate commerce. *Id.* (citing

---

1. Because we find that the CSRA falls within the second category of *Lopez,* we need not discuss its applicability to the remaining categories.

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 250, 85 S.Ct. 348, 354, 13 L.Ed.2d 258 (1964)); *see also United States v. Green*, 350 U.S. 415, 420, 76 S.Ct. 522, 525–26, 100 L.Ed. 494 (1956) (finding constitutional the Hobbs Act, 18 U.S.C. § 1951, which punishes "interference with interstate commerce by extortion, robbery or physical violence [by] . . . outlaw[ing] such interference 'in any way or degree.' "). With all of the above in mind, we find that the CSRA fits within the strictures of Congress' Commerce Clause power.

Although Black and Davis stress the significance of *Lopez* to their cases, the Court in *Lopez* dealt with a very different set of circumstances. In *Lopez*, the statute in issue was the Gun–Free School Zones Act, which made it a federal offense for any person to knowingly possess a firearm in a place that that person believes, or has reasonable cause to believe, is a school zone. *Lopez*, 514 U.S. at 551, 115 S.Ct. at 1626. In a 5–4 decision, the Supreme Court found that the Act exceeded Congress' Commerce Clause authority. The Court reasoned that the Act was a criminal statute that by its own terms had nothing to do with "commerce" or any sort of economic enterprise, however broadly "commerce" is defined. *Id.* at 561, 115 S.Ct. at 1630–31. The Court determined that the Act did not fit under the third area that may be regulated under the Commerce Clause because "[i]t cannot . . . be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* Finally, the Court observed that the Act contained no express jurisdictional element "which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at 562, 115 S.Ct. at 1631.

The Court reasoned that to uphold the Gun–Free School Zones Act it would have to pile inference upon inference such that it would transform congressional authority under the Commerce Clause to a general police power normally retained by the States. *Id.* at 567, 115 S.Ct. at 1633–34. In conclusion,

the Court recognized that the broad language of prior cases suggested the possibility of expanding the Commerce Clause power still further, but the Court found that to proceed any further "would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there will never be a distinction between what is truly national and what is truly local." *Id.* at 567–68, 115 S.Ct. at 1634 (citations omitted).

Congress need not break out the red pens, for we have a different case here. First, the Court in *Lopez* ruled out the first two categories and examined the Gun–Free School Zones Act only under the third area of activities that Congress may regulate under the Commerce Clause. Conversely, as we have found, the CSRA could conceivably fall under all three categories enumerated in *Lopez* and clearly falls under the second category. Second, "*Lopez* did establish that, where the legislative history is silent, a substantial interstate commerce nexus must be 'visible to the naked eye' without resorting to 'pil[ing] inference upon inference' until nothing is left of state autonomy." *United States v. Kenney*, 91 F.3d 884, 888 (7th Cir.1996). However, that is not a concern here; the CSRA by its very terms provides a multi-jurisdictional element because it applies only to past due interstate support payments. In addition, the legislative history of the CSRA is far from silent. The House of Representatives' Committee on the Judiciary expressly stated:

> H.R. 1241 [the bill that would become the CSRA] addresses the problem of interstate enforcement of child support by taking the incentive out of moving interstate to avoid payment. *The bill is designed to target interstate cases only*. These are the cases which state officials report to be clearly the most difficult to enforce, especially the "hard core" group of parents who flagrantly refuse to pay and whom traditional extradition procedures have utterly failed to bring to justice.

H.R. REP. No. 102–771, at 8 (1992) (emphasis added). This is just one of several instances where Congress stated that the CSRA would devote its attention solely to interstate cases. Finally, "*Lopez* must also be noted for what

it did not do." *Kenney*, 91 F.3d at 887. Although the majority in *Lopez* intended to draw an outer limit to congressional authority, this does not mean that *Lopez* represents a retrenchment of already well-established Commerce Clause precedent. *Id.* Black and Davis' reliance on *Lopez* is misplaced. It does nothing to sway our finding that the CSRA is a constitutional exercise of Congress' power to regulate interstate commerce.

Having found that Act falls within one of Congress' enumerated powers, the Commerce Clause, our review as to the propriety of the Act is deferential, and we think that Congress had a "rational basis" for exercising its commerce power. Congress made express findings that collecting child support from out-of-state parents has grown beyond the States' enforcement capabilities. We also find that the regulatory means chosen were "reasonably adapted to the end permitted by the Constitution." The CSRA respects the proficiency of the States in matters of domestic relations by not revisiting their initial judgments and by imposing its criminal sanctions only when a deadbeat parent moves out-of-state and willfully evades the obligation to support his children. Thus, the Act meets both prongs of our "rational basis" inquiry.

## 2. *The Tenth Amendment & Abstention*

■ Black and Davis next urge us to find that the CSRA violates the Tenth Amendment or to abstain from enforcing the Act on the basis of federalism and comity. They believe that the Act interferes with the States' traditional authority over matters concerning domestic relations and enforcement of criminal laws.[2]

■ The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. The Tenth Amendment and Article I complement each other. *Mussari*, 95 F.3d at 791. That is, if Congress acts pursuant to an enumerated power, there can be no

violation of the Tenth Amendment. *Id.* (citing *New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 2417–18, 120 L.Ed.2d 120 (1992)). Here, because we find that Congress has acted within its Commerce Clause power, we necessarily find no Tenth Amendment violation.

■ Black and Davis believe that we should abstain from enforcing the CSRA because it intrudes into family law matters traditionally reserved to the States. Black relies heavily on *Lopez* for this point. In *Lopez*, the Government argued that the possession of a firearm in a local school zone might result in violent crime which in turn would "substantially affect" interstate commerce because violent crime would cause insurance costs to increase and these costs would have to be spread among the population. *Lopez*, 514 U.S. at 563–64, 115 S.Ct. 1631–32. The Government suggested that citizens would not want to travel to areas believed to be unsafe and that guns in school zones would threaten the education process and result in a less productive nation. *Id.* at 564, 115 S.Ct. at 1632. The Court concluded that "[u]nder the Government's 'national productivity' reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example." *Id.* However, we reiterate that in *Lopez*, the Government argued that the Gun–Free School Zones Act "substantially affected" interstate commerce after the Court quickly disposed of the first two categories enumerated in *Lopez*. The context of the case before us is different from that in *Lopez* because the CSRA's relation to interstate commerce is not nearly so tenuous as that of the Gun–Free School Zones Act in *Lopez*.

More importantly, the CSRA does not attempt to regulate domestic relations. In Black's case, a federal court did not enter the initial divorce decree nor did it impose the underlying support obligation that Black refused to pay. Rather, a state court imposed the initial support obligation. Black frustrat-

---

**2.** We have already rejected Black's argument that the Act interferes with the States' enforce-

ment of criminal laws in our discussion of *United States v. Mussari, supra.*

ed that obligation by moving out-of-state and willfully evading state collection efforts. The longer that Black refused to pay, the more the amount of support which he owed accumulated until his case came to fall under the CSRA's authority. Thus, the CSRA did not intervene until "an obligation, already imposed under state law, [came] to wear an interstate face." *Mussari*, 95 F.3d at 791. We also stress that the CSRA does not permit a federal court "to revise the domestic relationship adjudicated by the State courts or to modify any part of a State court decree." *Sage*, 92 F.3d at 107. Finally, we have Congress' express intent that the CSRA was not meant to displace the States' authority over domestic relations. Congressman Henry Hyde, who spearheaded the CSRA, stated:

> I am especially incensed by those thousands and thousands of delinquent parents who make a mockery of State law by fleeing across State lines to avoid enforcement actions by State courts and child support agencies. . . . Too often as soon as delinquent fathers move to new States, they seem to vanish as far as State enforcement agencies are concerned. It is not that States have no mechanisms available, it is that these mechanisms lose their effectiveness when a father moves to a new State. . . . *H.R. 1241's goal is to strengthen, not to supplant, State enforcement efforts.*

138 CONG. REC. H7324, H7326 (daily ed. Aug. 4, 1992).

Davis urges abstention because the intervention of the federal judiciary under the CSRA would disrupt the establishment and/or the continuity of an important state policy—domestic relations law. He cites *Sosna v. Iowa*, 419 U.S. 393, 404, 95 S.Ct. 553, 559–60, 42 L.Ed.2d 532 (1975) and *Ankenbrandt v. Richards*, 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992) in support. However, in *Sosna*, the Court merely reiterated that it would disclaim any jurisdiction in the area of divorce. 419 U.S. at 404, 95 S.Ct. at 559–60. In *Ankenbrandt*, the Court also reaffirmed the validity of the domestic relations exception to federal jurisdiction in diversity cases. 504 U.S. at 697, 112 S.Ct. at 2211–12. The CSRA does not regulate domestic relations *per se* and does not derive its jurisdictional basis from diversity. Davis' abstention argument is misplaced.

In sum, this case does not give us an occasion to chafe over the principles underlying the Tenth Amendment, federalism, or comity. The CSRA does not rear its head into domestic relations issues reserved to the States. Rather, it seeks to enforce an obligation originally entered by a state court, which, due to the machinations of an evasive parent, the state court cannot enforce on its own.

## B. Whether a Court Arrearage Order is Required

■ Black stresses that a child support order is a fluid obligation, which he cannot shirk until the obligation has been fixed in a definite amount by a subsequent arrearage order. He argues that in order for the CSRA to kick in, a state court must have entered an arrearage order memorializing his failure to pay child support and the exact amount of support which he owes. That is, one cannot be in arrearage until one is determined to be in arrears. Davis echoes Black's argument and adds that unless a final judgment, or at least a formal court order, is entered against the noncustodial parent, it is impossible to satisfy the CSRA's jurisdictional element, requiring that a delinquent support obligation be greater than $5,000 or be unpaid for longer than one year. Davis further contends that, at the very least, the information entered against *him* did not allege a cognizable offense under the CSRA because no arrearage order was entered in his case.

The CSRA provides that "[p]ast due child support" refers to "any amount—(A) *determined under a court order or an order of an administrative process* pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and (B) that has remained unpaid for a period of one year, or is greater than $5,000. . . ." 18 U.S.C. § 228(d)(1) (emphasis added). It is the emphasized language above which gives both fathers pause; however,

their concerns are undue. As far as we can tell, this argument has been raised in only one other case, *United States v. Collins*, 921 F.Supp. 1028, 1031 (W.D.N.Y.1996), which thoroughly evaluated the issue. Like the defendant in *Collins*, Black and Davis ask that we read "determined under" to mean "determined by a court order or an order of an administrative process." *See Collins*, 921 F.Supp. at 1031. These are not the words Congress chose to use. *See id.*; *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").

Congress could have explicitly required that there be a specific arrearage order entered by a state court or agency which establishes the exact amount owed by the wayward parent. Congress instead required that there be a state court order which creates the underlying obligation due by the nonpaying parent. As the court in *Collins* explained:

> It is the trier of fact which must make the required determination whether, based upon the proven court order or agency ruling creating the support obligation, the past due support obligation is within the provisions of the Act, *i.e.* any amount unpaid for more than one year, or $5,000. *Collins*' interpretation, if accepted, would create an additional obstacle to compliance, contrary to the manifest purposes of the Act.

*Collins*, 921 F.Supp. at 1030–31. We agree. The CSRA does not envision a formal state order or agency ruling of arrearage as a prerequisite to the exercise of federal jurisdiction.

We are also persuaded by the district court's take on Black's argument:

> For every order, the possibility exists that a court may later alter or vacate it, whether because of changed circumstances, or even because the order was wrong when it issued. As a basic principle, however, this possibility of later change does not relieve the person subject to the order from the responsibility of following it until a court actually does change it. This principle supports the conclusion that *if an Indiana court ordered Black to pay child support and he willfully failed to do so for the time or in the amount specified in the Act, he violated the Act regardless of whether he might have been able to get the support order changed. No second order should be required to somehow shore up the first.*

(internal citation omitted) (emphasis added). Here, there were court orders in both cases which established both fathers' underlying obligations to pay child support. We are satisfied that this is all the language and the purpose of the CSRA require for there to be "past due child support." [3]

Should we not buy the whole arrearage argument, Davis offers an alternative argument that the information filed against him failed to allege a cognizable offense under the CSRA: Both of his children were emancipated at the time the information was filed. This does not matter. The information need only be "a plain, concise and definite written statement of the essential facts constituting the offense charged" and "need not contain ... a formal conclusion or any other matter not necessary to such state-

---

**3.** We also note that we have a factual problem with Black's and Davis' arguments. There *were* arrearage orders entered in both cases. Black concedes that on May 30, 1991, a Lake County superior court entered an order of arrearage in the amount of $5,787.50. As to Davis, the Government contends that he glosses over the significance of the Davises' agreement which established Davis' underlying support obligation and a state court order that the terms of the agreement be followed. There was also a court "Entry" from June 25, 1985, that found Davis in arrears in the amount of $9,700 as of March 3, 1986, $8,000 of which Davis subsequently paid. However, this same entry also awarded a judgment for Mrs. Davis in the amount of $28,186.37 as necessary for her and her children's support. Finally, the Government notes that there was an "Agreed Entry" which calculated that Davis owed $18,500 as of April 3, 1987 and which projected that he would owe $31,700 by October 30, 1988. A state court approved this agreement and ordered that Davis abide by its terms. Davis does not dispute the existence of these documents, but dismisses them because they are several years old and were never enforced. (Call it a hunch, but that might have something to do with why Davis is here today).

ment." FED.R.CRIM.P. 7(c)(1). The information, however, has to satisfy the requirements of the Due Process Clause of the Fifth Amendment. To this end, an information is sufficient if it contains the elements of the charged offense and fairly informs the defendant of the charge against which he must defend and enables the defendant to plead an acquittal or conviction in bar of future prosecution for the same offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974).

Here, the information alleged that Davis violated 18 U.S.C. § 228 because he is a resident of Texas who, from on or about October 25, 1992 to about October 13, 1995, willfully failed to pay a past due support obligation of approximately $100,000 with respect to two children who live in another state, Indiana. The information tracks the language of the CSRA and fills in the particular facts of Davis' case as to each element of the CSRA. We therefore find that the information complies with the dictates of criminal procedure and due process. The sufficiency of the information is determined by looking at the language it employs, separate and apart from the facts proved at trial. We agree with the Government that Davis has blurred considerations regarding the sufficiency of the information with those regarding sufficiency of the evidence. We also reiterate an earlier point that a past due amount of support in excess of $5,000 had accumulated well before either of Davis' sons was eligible for emancipation.

## C. *Davis' Remaining Concerns*

### 1. *Willfulness*

■ Davis moved to Texas in late 1985 or early 1986 and has remained there. He has not repeatedly changed jurisdictions or simply vanished from sight. He therefore contends that the CSRA is unconstitutional as applied to him because he did not move out-of-state with a willful intent to avoid child support payments. However, the CSRA merely requires that a nonpaying parent live in a state different from the state where that parent's child lives and that he or she willfully fail to pay a past due child support obligation. *See* 18 U.S.C. § 228(a). The CSRA does not mandate that the parent's move out-of-state be motivated by a willful attempt to avoid support; the parent need only willfully fail to pay the support. We therefore cannot agree with Davis' position.

■ Davis also argues that the Government failed to prove his willfulness beyond a reasonable doubt. Specifically, Davis contends that the trial court erred when it admitted his 1992 and 1993 federal tax returns and that these records should be stricken from the record. Davis concludes that striking the returns from evidence would necessarily compel this Court to vacate his conviction because these returns were the Government's only evidence of his willfulness.

At trial, Davis objected to the admission of his original 1992 and 1993 returns because they were not his final returns for those years. When the trial court admitted the returns over Davis' objections, Davis moved for a mistrial. At the hearing on Davis' motion for judgment of acquittal or a new trial, Davis introduced his amended 1992 and 1993 tax returns, which were filed in 1996. The district court determined that the introduction of Davis' amended returns would not establish that he had no income in 1992 and 1993. The amended returns only showed that Davis reported the income differently in his amended returns—as borrowed funds rather than as earned income. The trial court determined that "Davis' claim in 1996 that the income he reported in 1992 and 1993 was in reality borrowed money is much more damaging than helpful to him." It considered the 1996 returns suspect. The court concluded, "Considering all of the surrounding circumstances [in Davis' case], this Court is not persuaded that the amended returns are exculpatory."

■ On appeal, Davis essentially argues that the district court erred in admitting his 1992 and 1993 tax returns and in refusing to admit his amended returns. We review a district court's admission of evidence for abuse of discretion. *United States v. Short,* 4 F.3d 475, 479 (7th Cir.1993). It makes no difference from what source Davis claims to have received income. What matters is that

he still had income, in whatever form he wishes to characterize it. Accordingly, we find no abuse of discretion in the district court's refusal to admit the amended returns.

Because it was not error to refuse to admit Davis' amended tax returns, we find that Davis' declaration to the IRS that he had income for 1992 and 1993, together with his nonpayment of child support after October 1992, were clear evidence of his willfulness. Davis is also mistaken that there was no other evidence of his willfulness. The district court considered that at the time of their divorce, Davis told his wife that he was going to move to Texas to avoid paying child support. The court also weighed that what Davis did pay in support was very little in proportion to his obligation. Thus, there was ample evidence to find Davis' nonpayment "willful."

## 2. *The Ex Post Facto Clause*

█ We review the constitutionality of a federal statute *de novo*. *United States v. Wilson*, 73 F.3d 675, 678 (7th Cir.1995). The Ex Post Facto Clause of the Constitution prohibits the retrospective application of a criminal law which prejudices a defendant. *See* U.S. CONST. art. I, § 9, cl. 3. A statute violates the Ex Post Facto Clause when it:(1) criminalizes conduct that was legal when done;(2) imparts greater punishment for an offense than that which existed at the time the offense was committed; and (3) eliminates a defense available under the law that was in effect at the time the offense was committed. *Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (citations omitted); *see also United States v. Couch*, 28 F.3d 711, 713 (7th Cir.), *cert. denied*, 513 U.S. 993, 115 S.Ct. 495, 130 L.Ed.2d 405 (1994).

Davis argues that his nonpayment was legal when done because when the CSRA was enacted on October 25, 1992, his son James was twenty-two years old, and therefore emancipated. James was also over twenty-one years old when Davis was charged by information on December 22, 1995. Davis also contends that his younger son John was eighteen years old when the Act was passed and could have been adjudged emancipated

by an Indiana court at that time. John was also over twenty-one years old when the charges against Davis were brought. Davis offers that in Indiana, a past due child support obligation cannot be enforced with a criminal or contempt action once the youngest child is no longer dependent. As to punishment, Davis argues that the district court initially found that the highest possible amount of restitution would be $21,600, but at sentencing the court imposed restitution totaling $111,800, an amount that traces back to the entry of the Davises' divorce decree. Finally, Davis maintains that before the passage of the CSRA, he could have presented factors in mitigation to a state court tribunal with authority to reduce his child support obligation. However, Davis claims that the district court's ruling at trial and imposition of restitution deprived him of that right. While some of these observations may be true, they in no way render the CSRA, as applied to Davis, an ex post facto law.

"Clearly, the CSRA, on its face, does not violate the *ex post facto* clause insofar as it imposes punishment upon a person who, after October 25, 1992, willfully fails to pay a past due child support obligation." *United States v. Crawford*, 115 F.3d 1397, 1402 (8th Cir.1997). In this case, the information charged, and the district court found beyond a reasonable doubt, that "from on or about October 25, 1992, to on or about October 13, 1995," Davis willfully failed to pay a past due child support obligation of roughly $100,000 for two children who live in another state. The time-frame in the information post-dated the effective date of the statute. The CSRA afforded Davis fair warning that his conduct would be considered criminal, but he elected not to pay. Davis' prosecution did not violate the Ex Post Facto Clause "because he was punished in accordance with the law as it existed at the time of his offense." *Id.* at 1402. In short, an arrearage of more than $5,000 accrued before either child's emancipation. Emancipation did not wipe away the arrearage that had already accumulated. Thus, there is no question that Davis owed at least $5,000 in unpaid child support. The CSRA punishes a parent for nonpayment of such a debt. That this debt arose before the

passage of the CSRA is irrelevant. What is relevant is that it remained unpaid.

■ As to the second prong of *Collins v. Youngblood,* as near as we can tell, Davis argues that, in calculating the restitution amount, the district court should not have included obligations that accrued before the effective date of the CSRA. We disagree. Restitution is not "punishment" within the meaning of the Ex Post Facto Clause. *Crawford,* 115 F.3d at 1403; *United States v. Hampshire,* 95 F.3d 999, 1006 (10th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 753, 136 L.Ed.2d 690 (1997). In *Hampshire,* the Tenth Circuit reasoned that a restitution order under the CSRA does not inflict punishment on the parent because it attempts to compensate the child for the parent's failure to pay past due support. 95 F.3d at 1006.

Davis misconstrues the district court's findings. The district court found the Ex Post Facto Clause inapplicable because, even if the court were to consider only the amount of Davis' total arrearage that had accrued after the passage of the CSRA, that amount exceeded the CSRA's statutory amount. Specifically, the court stated that Davis had owed $21,600 since the passage of the Act, which remained unpaid for one year and was certainly greater than $5,000. The court was only addressing Davis' argument that he was being held responsible for conduct that was not criminal before the passage of the CSRA. The court did not hold that $21,600 was the highest possible amount of restitution for which Davis could be found liable. Davis apparently takes the court's findings to mean that it agrees with his contention that the court can consider only those obligations that accrued after the effective date of the CSRA.

The district court's tracing back to the entry of the Davises' divorce decree in im-posing restitution in the amount of $111,800 does not render the CSRA an ex post facto law as applied to Davis. We have already stated that restitution is not "punishment," but even if it were, the very terms of the CSRA permit, and in fact, instruct the district court to do exactly what it did in this case. "In any event, the CSRA [itself] provides '[u]pon conviction under this section, the court shall order restitution ... in an amount equal to the past due support obligation *as it exists at the time of sentencing.*'" *Crawford,* 115 F.3d at 1403 (citing 18 U.S.C. § 228(c)) (emphasis added).

In sum, even if restitution is tantamount to punishment within the context of the Ex Post Facto Clause, the district court did not punish Davis for behavior that was innocent at the time it was done, and the "punishment" here is not greater than that which was authorized at the time the offense occurred. *See id.; see also Hampshire,* 95 F.3d at 1006. Quite simply, "[t]he CSRA gives fair warning that the district court shall order restitution in the full amount due at the time of sentencing." *Crawford,* 115 F.3d at 1403.

Finally, the CSRA does not eliminate defenses available under the law in effect at the time the offense was committed. Before the passage of the CSRA, Davis had the legal ability to present mitigating factors to a state court with the authority to reduce the amount of support he owed. The CSRA did not eliminate this possibility. The district court considered Davis' emancipation argument at least twice. When it found Davis guilty, the district court determined that it was up to Davis to bring his emancipation claim to the state court's attention and found that Davis did not do so.[4] The district court again addressed the issue in its order on Davis' motion for acquittal, or a new trial and

---

4. Specifically the court stated:
   Now, secondly, when the argument is made that because these children were emancipated prior to this case being filed, that that would lead to a finding that there wasn't any such willful failure to pay or that that would mean there wasn't any outstanding child support obligation, I think in the interplay between the state's responsibility and the Federal Government's responsibility, it is the state's responsibility to make that emancipation finding, and that is not the responsibility of this Court. That is not one of the elements [of the CSRA]. That is not the responsibility of this Court. It is the responsibility of the defendant himself, Mr. Davis, when he thinks those kids are emancipated to proceed back to the court and have that finding made and not wait until the kids are 21 years old. If that is the benefit he wants to get, then that is up to him to go do it. (emphasis added).

found it irrelevant.[5] That the district court disagreed with Davis' emancipation defense does not mean that it failed to consider it, and it certainly does not mean that the CSRA eliminates any mitigation factors available under state law. In sum, Davis has not met any of the factors enumerated in *Collins v. Youngblood.* Davis has failed to show how the CSRA violates the Ex Post Facto Clause.

Finally, Davis alleges that when the district court entered its finding of guilt, it refused to apply or consider factual and legal defenses available under Indiana law, and thereby denied him the right to due process of law. As far as we can tell, the only defense discussed by the district court was emancipation and Davis does not elaborate on exactly what other defenses the district court refused to hear. We have already found this argument unavailing when Davis brought it under the rubric of the Ex Post Facto Clause. Davis' allegation works no better as a due process argument for the district court in fact entertained his emancipation argument.

Davis has repeatedly made emancipation an issue, so we feel compelled to echo an earlier, much beleaguered, point: Davis amassed more than $5,000 in past due child support before either of his children was eligible for emancipation, and this amount remained outstanding at the time of the passage of the CSRA and during the time period alleged in the information—period. Emancipation ends a child support obligation, but it does not retroactively whisk away any arrearage that accumulated before emancipation. The district court correctly found that the issue of emancipation is irrelevant in Davis' case.

### Conclusion

We AFFIRM the district courts' findings that the CSRA is a valid exercise of Congress' plenary power under the Commerce Clause. We also AFFIRM as to all other issues raised on appeal.

5. The court stated:
    Such a defense [of emancipation], however, is irrelevant given the Court's specific finding that as of December 31, 1987, Davis was behind more than $5,000.00 and had been for more than a year. At least half of the $30,-

000.00 Davis owed had accumulated while his children were under the age of sixteen. Davis does not argue that his children were emancipated before they turned sixteen. Thus on these findings, Davis' emancipation defense is irrelevant.