913 A.2d 146 (2007)
389 N.J. Super. 391
Nancy GIORDANO, Plaintiff-Respondent,
v.
John GIORDANO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 6, 2006.
Decided January 9, 2007.
John Giordano, appellant pro se.
Nancy Giordano, respondent pro se.
Before Judges WEFING, C.S. FISHER and MESSANO.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we reject an argument that federal law, once triggered, preempts state law or otherwise prohibits a state court from compelling a delinquent parent to pay child support arrearages at a rate greater than that imposed by a federal court in ordering restitution pursuant to the Child Support Recovery Act, 18 U.S.C.A. § 228.

*147 I
The relevant facts are few and not in dispute. The parties were married, had three children, and, in 1988, were divorced. As a result of failing to pay child support for considerable periods of time, defendant John Giordano was convicted in February 1995 of willfully failing to pay child support, N.J.S.A. 2C:24-5. He was sentenced to 364 days in the county jail but, after serving four months, was released and moved to Florida. He paid child support from August through November 1995, but then "disappeared" for the next five years.
On October 13, 2000, defendant was located through the efforts of a federal program known as "Project Save Our Children." He was extradited to New Jersey and later pled guilty to violating the Child Support Recovery Act, 18 U.S.C.A. § 228(a)(3), which makes unlawful an obligor's willful failure to pay child support with respect to a child who resides in another state if such obligation has remained unpaid for a period longer than two years or is in an amount greater than $10,000. Defendant was sentenced on October 29, 2002 to a five-year period of probation and was, as mandated by 18 U.S.C.A. § 228(d), ordered to pay restitution pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C.A. § 3663A. The federal judge directed that defendant make restitution in the amount of $232,934.42 at the rate of $400 per month.
More recently, defendant appealed a Family Part order entered on November 12, 2004. That order declared the two older children to be emancipated, readjusted defendant's obligation by directing that he pay plaintiff $147 per week for the support of their youngest child, and required that defendant pay an additional $100 per week against the substantial child support arrearage. We affirmed that order by way of an unpublished opinion. Giordano v. Giordano, Docket No. A-4194-04T1, 2005 WL 3999745 (App.Div., May 12, 2006). On May 31, 2005, during the pendency of that appeal, the federal judge granted defendant's request for a modification of the conditions of probation and directed defendant to make restitution payments "of at least $100 each month," less than one-fourth of what the Family Part order required.
On September 30, 2005, a Family Part judge entered an order, which (1) held the parties' youngest child to be emancipated as of July 25, 2005, (2) terminated defendant's child support obligation, (3) declared that $250,777.42 in child support remained due, and (4) directed that this arrearage be paid by defendant at the rate of $247 per week. Soon after, defendant moved in the Family Part for relief from the September 30, 2005 order, arguing, among other things, that the Family Part was without jurisdiction either to determine the amount of arrears owed or to impose a particular payment schedule because, in his view, the federal court had "continuing jurisdiction" over the matter. Implicitly finding no merit in that contention, the Family Part judge entered an order on January 23, 2006, which modified the September 30, 2005 order by directing that the child support arrearage be paid at the rate of $150 per week  a rate lower than the Family Part's September 30, 2005 order but greater than the May 31, 2005 federal order.
Defendant has appealed, arguing that the January 23, 2006 order should be set aside because it conflicts with the May 31, 2005 federal order. Although the pro se briefs do not state the case in legal terms, we discern from defendant's contentions that he believes the federal Child Support Recovery Act preempts state law and prevents state courts from imposing or enforcing child support orders in a manner *148 different from or in more onerous terms than that imposed by federal courts. We reject these contentions.

II
Congress' power to preempt state law is derived from clause 2 of Article VI of the United States Constitution, the Supremacy Clause. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206, 213 (1985). Federal preemption of state law may be either expressed or implied. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 613 (1977). Express preemption is "determined from an examination of the explicit language used by Congress." Gonzalez v. Ideal Tile Importing Co., 184 N.J. 415, 419, 877 A.2d 1247 (2005). Implied preemption can appear in two forms: "field preemption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict preemption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73, 84 (1992) (internal quotations omitted). Since the Child Support Recovery Act does not expressly declare that it displaces state law, there is no basis for a claim of express preemption. Determining the presence of implied preemption, however, is often nuanced and difficult to ascertain. The "ultimate touchstone" is the intent of Congress, Allis-Chalmers, supra, 471 U.S. at 208, 105 S.Ct. at 1910, 85 L.Ed.2d at 214, the ascertaining of which commences with a presumption that there was no intent to displace state law, particularly where, as here, "the field which Congress is said to have preempted has been traditionally occupied by the States," Gonzalez v. Ideal Tile Importing Co., 371 N.J.Super. 349, 363, 853 A.2d 298 (App.Div.2004), aff'd, 184 N.J. 415, 877 A.2d 1247 (2005). We are satisfied from the language and legislative history of the Child Support Recovery Act that its scope is not so "pervasive" as to generate an inference that the states were left no room to act in this field. And we are likewise convinced that the states' continued exercise of their traditional authority over domestic relations matters, including the entry and enforcement of child support orders, was not thought by Congress to represent an obstacle to federal regulation.
Field preemption is not present because the Child Support Recovery Act does not extend to all child support obligors. It expressly limits its application to interstate obligations  in order to constitute a valid exercise of congressional power under the Commerce Clause, U.S. Const., art. I, § 8, cl. 3  and also applies only to obligors who "willfully" fail to comply with their obligations and who accrue arrearages in particular amounts or for a designated length of time.[1] Obviously, as a result of these *149 limitations, there are hosts of child support obligors who are not subject to the Child Support Recovery Act. Thus, because Congress has confined its reach only to a small subset of delinquent child support obligors, we conclude that Congress had no intent to exclusively govern the child support enforcement field.
Conflict preemption is also not present here. There is nothing about the Child Support Recovery Act which would suggest that "compliance with both federal and state regulations is a physical impossibility," or that state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Gade, supra, 505 U.S. at 98, 112 S.Ct. at 2383, 120 L.Ed.2d at 84.
In considering whether conflict preemption precludes the application of state law, we observe that the Child Support Recovery Act grants a broad scope of authority to a federal judge to order restitution when an obligor is found to have willfully failed to pay child support in the particular circumstances outlined in 18 U.S.C.A. § 228(a). For example, it is understood that 18 U.S.C.A. § 228(d) and the MVRA require that a federal court order an offender of the Child Support Recovery Act to make restitution in the full amount of the unpaid child support, not just the amount that accrued during the period covered by the information or indictment. See United States v. Craig, 181 F.3d 1124, 1127 (9th Cir.1999). It has also been held that the MVRA permits an award of interest on unpaid child support. See United States v. Stephens, 374 F.3d 867, 869 (9th Cir.2004).
The federal courts have broadly construed the MVRA when applied to a delinquent parent because, in enacting the Child Support Recovery Act, Congress intended to take the incentive out of the delinquent parent's attempts to avoid the processes of state courts by moving out of the child's home state. United States v. Gill, 264 F.3d 929, 933 (9th Cir.2001). Accordingly, although the power given to federal courts to order restitution has been expansively viewed, that power springs from and remains linked to the congressional intent to provide aid to state courts in their enforcement of their support orders, as more fully explained by the Court of Appeals for the Seventh Circuit:
Congress has expressly recognized that collecting past due child support obligations from out-of-state deadbeat parents has outgrown state enforcement mechanisms. In a report to accompany . . . the bill that would become the CSRA . . ., the House of Representatives' Committee on the Judiciary noted that in 1989, $16.3 billion in child support payments were due, but only $11.2 billion were made. The Committee expressed concern that this deficit continues to average $5 billion annually. It also found that statistics suggest that delinquent parents' chances for successfully avoiding support payments increase markedly when they cross state lines.
At least forty-two states have made willful failure to pay child support a crime, punishable in some states by imprisonment for up to ten years, but the Committee noted that the ability of those states to enforce such laws outside their own boundaries is severely frustrated. Although most states have adopted the Uniform Reciprocal Enforcement of Support Act (URESA), which includes provisions that provide *150 for the extradition of interstate child support defendants and the processing of requests for enforcement of support orders, the Committee concluded that "inter-state extradition and enforcement in fact remains a tedious, cumbersome and slow method of collection." On the day of the CSRA's passage in the House of Representatives, Congressman Charles Schumer stated:
The need for this legislation is clear. . . . Many of our States have done their best. . . . But the ability of those States to enforce such laws outside their own boundaries is hobbled by a labyrinth of extradition laws and snarls of red tape. As a result, skipping out on child support is one of the easiest crimes to get away with in America today.
With all of the above concerns in mind, Congress passed the CSRA.
[United States v. Black, 125 F.3d 454, 458-59 (7th Cir.1997) (citations deleted).]
As a result, it is apparent that in these matters both the federal and state jurisdictions share a common goal  the collection of delinquent child support. Although the existence of this shared interest might suggest conflict preemption, the fact remains that Congress did not intend to supplant state law in enacting the Child Support Recovery Act. To the contrary, Congress intended to support and enhance state enforcement efforts, which efforts, as observed in United States v. Black, supra, are all too frequently convoluted and at times thwarted when a delinquent parent moves out of the child's home state. A state court's imposition of even more onerous terms or additional obligations on a delinquent parent than imposed by a federal court is not something likely to interfere with and certainly would not constitute an obstacle to a federal court's collection efforts, but would merely add to the burden of repayment justifiably imposed upon those delinquent parents who have attempted to frustrate collection efforts by moving across state lines.
Indeed, it would be incongruous to conclude that the continued exercise of state jurisdiction over a child support obligation would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Gade, supra, 505 U.S. at 98, 112 S.Ct. at 2383, 120 L.Ed.2d at 84, when it is a state's child support order that provides the predicate for the exercise of federal jurisdiction and when the congressional purpose was to aid states in their collection of past due interstate support payments. As a result, we conclude that federal preemption does not bar the continued exercise of a state's jurisdiction to enter and modify child support orders, to ascertain when a delinquent party's obligation should be increased or left unchanged, to regulate the repayment rate of arrearages, or to continue to enforce its own orders to the best of its ability.
In short, the Child Support Recovery Act, when triggered and thereafter applied by federal courts, enhances state enforcement efforts by providing a greater or more efficient jurisdictional reach than possessed by the states. There is nothing in the Child Support Recovery Act, or its legislative history, which would remotely suggest that Congress intended to assume exclusive jurisdiction over a parent's child support obligation or that Congress either intended to bar a state court from making adjustments in child support orders or meant to limit a state's efforts to collect outstanding child support arrearages. The federal and state regulations do not conflict but instead form a symbiotic relationship by which federal law enhances the *151 goals pursued by the states in these important matters.

III
For these reasons, we reject defendant's novel contention that a state court is barred from exercising jurisdiction over the enforcement of a child support order once the obligor is convicted and sentenced by a federal court pursuant to the Child Support Recovery Act. Our courts' statutory and common law authority to independently enter, modify and enforce child support orders remains unhampered by the application of federal law and is guided only by equitable notions and considerations.[2] Accordingly, in this case, it was entirely appropriate for the Family Part judge, upon declaring the youngest child to be emancipated, to modify the weekly arrearage payment to $247; as can be readily seen, the judge at that time thought it appropriate, in light of the termination of the weekly $147 child support obligation caused by the emancipation of the youngest child, to increase the weekly arrearage payment from $100 to $247. Such a change had no additional impact on defendant because his total weekly payment remained the same. By the same token, when defendant moved in the Family Part to vacate or modify that order, alleging health problems as well as the jurisdictional issue pursued here in his appeal, the judge also acted within the court's equitable jurisdiction in modifying that arrearage payment from $247 per week to $150 per week.
We conclude that although the federal courts possess considerable authority when federal jurisdiction is triggered by the application of the Child Support Recovery Act, that authority exists to enhance and not to supplant a state's continuing jurisdiction over all aspects of defendant's child support obligation, which remains as broad as required to achieve a just result in light of all the circumstances. We therefore hold that the Family Part judge acted well within the scope of the court's jurisdiction in modifying defendant's weekly child support arrearage obligation, regardless of the fact that it imposed a greater monetary obligation on defendant than that imposed by the May 31, 2005 federal court order.
Affirmed.
NOTES
[1] 18 U.S.C.A. § 228(a) declares that "[a]ny person who . . . (1) willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000; (2) travels in interstate or foreign commerce with the intent to evade a support obligation, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000; or (3) willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 2 years, or is greater than $10,000; shall be punished as provided" in 18 U.S.C.A. § 228(c). Upon a conviction based upon 18 U.S.C.A. § 228(a), together with the term of incarceration or probation that may be imposed depending upon which of the subsections has been violated, "the court shall order restitution [pursuant to the MVRA] in an amount equal to the total unpaid support obligation as it exists at the time of sentencing." 18 U.S.C.A. § 228(d).
[2] Certainly, we can find nothing inequitable about an order that requires defendant to repay a child support arrearage of approximately $250,000 at the rate of $150 per week, even though, at that rate it will take the sixty-one year old defendant approximately thirty years to fully compensate plaintiff. (The existing federal order, which requires the payment of only $100 per month would allow defendant over 200 years to fully compensate plaintiff).