In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2262

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERT HERBERT KRAMER,

Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 98 CR 140--Sarah Evans Barker, Chief Judge.


Argued November 12, 1999--Decided September 5, 2000



   Before FLAUM, Chief Judge, and RIPPLE and ROVNER,
Circuit Judges.

   RIPPLE, Circuit Judge.  Robert Herbert Kramer was
found guilty of the willful failure to pay a past
due child support obligation in violation of the
Child Support Recovery Act ("CSRA"), 18 U.S.C.
sec. 228. On appeal, Mr. Kramer claims that he
did not receive service of process in the state
action seeking the child support order and that
his federal conviction based on his noncompliance
with that state order is therefore invalid. For
the reasons set forth in the following opinion,
we reverse Mr. Kramer's conviction and remand to
the district court for further proceedings
consistent with this opinion.

I
BACKGROUND
A.

   Mr. Kramer, while a resident of Minnesota,
worked as an over-the-road truck driver for
Mayflower Van Lines, Inc. ("Mayflower"). In
January 1980, when he first started working for
Mayflower, he attended three weeks of training
sessions in Indianapolis, Indiana. While in
Indianapolis, he had a brief sexual relationship
with Janice Jacobs, a resident of Indiana. By
January 30, at the latest, Mr. Kramer left
Indiana to return to Minnesota. On November 25,
1980, Ms. Jacobs gave birth to a son, and she
claims that Mr. Kramer is the father. When the

child was born, Mr. Kramer received a call from his dispatcher, telling him that he was a father.

In late 1982, Jacobs informed Mr. Kramer that she intended to file a paternity suit against him. She then filed a paternity action in the Marion County Circuit Court of Indiana. Mr. Kramer never appeared at any of the proceedings; Mr. Kramer submits that he never received either formal service of process or informal notification of the paternity proceedings. The state court file does not show that process was served, and neither party asserts that Mr. Kramer received service of process. In December 1982, the Indiana court established Mr. Kramer's paternity by default and directed him to pay $25 per week in child support.

Mr. Kramer insists that he first learned of the Indiana child support order in the fall of 1990. At that time, Mayflower informed him that an Indiana court had ordered it to withhold $50 from each two-week paycheck. This was required, Mayflower told Mr. Kramer, because of an outstanding child support order. Due to the attachment of his wages, Mr. Kramer hired an attorney to contest the default judgment establishing his paternity. Mr. Kramer failed to appear at his hearing dates, and his attorney eventually withdrew from representing him. After his attorney's withdrawal from representation, Mr. Kramer did not pursue this collateral attack on the default judgment. Then, in January 1992, Mr. Kramer stopped working for Mayflower. He left Mayflower because he had failed to renew his trucker's license and because he was suffering from both asthma and self-diagnosed depression. This depression, he claims, was caused in part by his worries over the outstanding child support order.

Starting in June 1993, Mr. Kramer worked for Lenneman Transport. While at Lenneman Transport, none of his wages were attached due to the child support order. However, he injured his back while at work and left Lenneman Transport in February 1994. Since that time, Mr. Kramer has not worked at all because he does not believe that he could pass a physical examination due to his bad back, his asthma, and his depression.

Mr. Kramer moved to the State of Washington in September 1996. Then, in July 1998, he was visited by an FBI agent about the outstanding child support order. Mr. Kramer informed the agent that, although he might be able to return to work, he did not see any reason to do so until the support order was cleared up because he would "just be attacked all the time." Tr.I at 41. A

federal grand jury thereafter indicted Mr. Kramer on October 15, 1998, for the willful failure to pay, between October 1993 and December 1995, a past due support obligation with respect to a child residing in Indiana.

B.

The United States District Court for the Southern District of Indiana conducted a bench trial on the criminal charge against Mr. Kramer. At the close of the Government's case, Mr. Kramer moved for a judgment of acquittal, asserting that the Government had failed to prove that the underlying child support order was valid. He claimed that the order was invalid because he did not receive service of process and that the state court therefore did not have personal jurisdiction over him. The district court reserved its decision until the completion of the trial.

At the end of the trial, the court found Mr. Kramer guilty of the willful failure to pay a past due support obligation in violation of 18 U.S.C. sec. 228. The court first stated that the Government needed to prove beyond a reasonable doubt (1) that Mr. Kramer acted willfully, (2) in failing to pay, (3) a past due support obligation, (4) with respect to a child who resided in another state. The court found that, although "Kramer may not have learned of the lawsuit or the entry of the default judgment in 1982, it is clear that he understood by at least 1990 that such an order had been entered against him." R.20 at 7. Next, the court found that Mr. Kramer had failed to pay the $25 per week mandated by the court order during the period of the indictment. The court also found that, during the time stated in the indictment, the child covered by the support order resided in Indiana and Mr. Kramer resided in Minnesota. "Therefore," the court concluded, "the evidence establishes beyond a reasonable doubt that Kramer knew prior to October 1993 that an Indiana state court had ordered him to pay child support for a child that resided in a different state than him and that he failed to do so." Id. at 8.

The court next discussed the element of willfulness and stated: "We harbor no hesitancy in concluding that Kramer acted willfully in not paying the support amount due." Id. The court noted that Mr. Kramer had challenged the support order when it served his interest to do so. But then, when he left Mayflower and was no longer subject to the attachment of his wages, he no longer believed that he owed support. "Indeed," the court stated, "we do not credit Kramer's assertion that he simply forgot that an

outstanding support order existed, as other testimony he provided revealed that the outstanding matter caused him such discomfort as to contribute to his ongoing 'depression.'" Id. at 9.

The court also addressed Mr. Kramer's argument that the underlying support order was invalid because the state court lacked personal jurisdiction over him. The court characterized Mr. Kramer's defense as a collateral attack on the state court default judgment. First, the court held that federal courts do not need to question the validity of support orders issued by state courts before entering a judgment of conviction under sec. 228. The court relied upon United States v. Bailey, 115 F.3d 1222, 1232 (5th Cir. 1997), for the proposition that the language of sec. 228 does not require a federal court to look beyond the four corners of the state child support order or permit a collateral attack on the state court order in federal court. Mr. Kramer, the court explained, should have challenged the state court default judgment through state channels, of which he was aware, as evidenced by his attempted collateral attack in 1991. His failure to complete that process, continued the court, does not invalidate the support obligation element of sec. 228.

Next, the court held that Mr. Kramer had been afforded sufficient due process in his federal prosecution. According to the court, Mr. Kramer had argued that, because he did not receive due process in the state default judgment, he was denied due process in the federal conviction because it relied on the state default judgment. According to the court, the Supreme Court in United States v. Mendoza-Lopez, 481 U.S. 828 (1987), required the availability of meaningful review of a decision of an administrative proceeding as a necessary condition before a court imposed criminal sanctions based on that administrative decision. The court stated, however, that Mr. Kramer possessed an opportunity to seek review of the state default judgment before the imposition of his criminal sanction. Moreover, the court explained, "[a]ny putative due process violation occurring in 1982 was cured by the Indiana state court's granting Kramer a hearing to challenge that default judgment in late 1991." R.20 at 12.

For these reasons, the court found Mr. Kramer guilty of the willful failure to pay a past due child support obligation for the period between October 1993 and December 1995. The court sentenced Mr. Kramer to one year of probation, with 60 days community confinement as a condition of his probation, and it ordered him to pay

$19,750.00 in restitution.

## II
## DISCUSSION
### A.

Mr. Kramer submits that he cannot be found guilty under the CSRA because the Government did not establish that the Indiana court that issued the support order had personal jurisdiction over him. He contends, as he did in the district court, that he was never served process nor notified of the state paternity proceeding which produced the support obligation. Without such notice and opportunity to be heard, he submits, the Indiana court did not have personal jurisdiction over him, see Mullane v. Central Hanover Bank, 339 U.S. 306, 313 (1950), and the default judgment issued by the Indiana state court does not constitute a valid "support obligation" under the CSRA.

The Government has another view. It submits that it needed to prove beyond a reasonable doubt only the existence of the support order. Mr. Kramer's position, it contends, is an impermissible collateral attack on the state court child support order. Relying on our decision in United States v. Black, 125 F.3d 454 (7th Cir. 1997), the Government argues that a federal court cannot revise the domestic relationship decided by a state court. Therefore, the Government submits, Mr. Kramer's conviction should be upheld.

### B.
### 1.

We begin, as we must, with the wording of the statute. The CSRA punishes any person who "willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000." 18 U.S.C. sec. 228(a). The term "support obligation" is defined as "any amount determined under a court order or an order of an administrative process pursuant to the law of a State . . . to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living." 18 U.S.C. sec. 228(f)(3). Nothing in this definition suggests that a defendant may defend a prosecution under this statute by contesting the substantive merits of the underlying support obligation. Indeed, courts interpreting the CSRA, including this one, have spoken with one voice on that issue. See United States v. Brand, 163 F.3d 1268, 1275-76 (11th Cir. 1998); United States v. Black, 125 F.3d 454, 463 (7th Cir. 1997); United States v. Bailey, 115 F.3d 1222, 1232 (5th Cir.

1997); United States v. Johnson, 114 F.3d 476, 481 (4th Cir. 1997); United States v. Sage, 92 F.3d 101, 107 (2d Cir. 1996).

The question remains, however, whether a defendant in a federal CSRA prosecution may defend on the limited ground that the underlying state support obligation was imposed by a court that did not have personal jurisdiction over the defendant. The general rule for default judgments in civil actions is that the judgment may be attacked collaterally on the narrow ground that the judgment was void because the rendering court lacked the requisite nexus with the defaulting party or gave inadequate notice of the support action to that party. See Burnham v. Superior Ct. of Cal., 495 U.S. 604, 609-11 (1990); Kulko v. Superior Ct. of Cal., 436 U.S. 84, 91 (1978); see also World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980). To sustain the Government's position therefore, we must ascertain that Congress, in enacting the CSRA, intended to establish an approach different from the rule that usually applies.
2.

In an effort to demonstrate that Congress intended to permit a successful CSRA prosecution without a showing that the underlying support judgment had been issued by a court properly exercising personal jurisdiction over the defendant, the Government invites our attention to Custis v. United States, 511 U.S. 485 (1994), and Lewis v. United States, 445 U.S. 55 (1980). We shall examine each of these cases in chronological order.

In Lewis, the defendant was charged with being a felon in possession of a firearm in violation of 18 U.S.C. sec. 1202(a)(1). See 445 U.S. at 57. In defending against the charge, he attempted to attack collaterally the prior state conviction that was the basis for prosecuting him as a felon in possession of a firearm. He claimed that this state conviction was invalid because he had not been represented by counsel, and, therefore, the conviction had been obtained in violation of his Sixth and Fourteenth Amendment rights. See id. at 57-58. The Supreme Court rejected his argument. The Court stated that the statute forbidding a felon to possess a firearm did not permit a collateral attack on the underlying conviction on constitutional grounds. See id. at 65 (discussing 18 U.S.C. sec. 1202(a)(1)). The Court explained that the plain language of the statute contained no exceptions to the definition of "prior conviction." Id. at 60. Moreover, continued the Court, Congress would have made such an exception explicit because, in other sections of the same statute, it had explicitly made exceptions to

liability for those individuals who, despite a felony conviction, could be entrusted with a firearm under limited circumstances. See id. at 61-62 (listing sections). Other statutes, the Court continued, explicitly permitted a defendant to challenge, by way of defense, the validity or constitutionality of the predicate felony. See id. at 62 (listing statutes). The Court further noted that the legislative history did not indicate any intent by Congress to permit a felon to contest the validity of the underlying conviction. See id. at 62-63. Indeed, the Court noted that the legislative history made clear that Congress intended a "sweeping prophylaxis" against the misuse of firearms. Id. at 63. Additionally, other sections forbade the reception of a firearm by someone indicted for a felony even if he was subsequently acquitted. See id. at 64. Finally, the Court noted that the convicted felon is not without relief; he could have had the underlying conviction removed by a qualifying pardon or could have challenged the prior conviction in the state court. See id. As the Court concluded, "Congress clearly intended that the defendant clear his status before obtaining a firearm." Id.

The later Supreme Court case of Custis involved an interpretation of the Armed Career Criminal Act, 18 U.S.C. sec. 924(e), which provides for the enhancement of a sentence of a convicted firearms possessor who "has three previous convictions . . . for a violent felony or a serious drug offense." 511 U.S. at 487. Interpreting the statute before it, the Supreme Court held that there was no indication that Congress had intended to permit the defendant to challenge the predicate convictions on the ground that they were procured through errors of constitutional magnitude. See id. Notably, the Court grounded its analysis on the text and the structure of the particular statute before it, the Armed Career Criminal Act. See id. at 490-91. "The statute focuses on the fact of the conviction and nothing suggests that the prior final conviction may be subject to collateral attack for potential constitutional errors before it may be counted." Id. at 490-91. Moreover, noted the Court, the statute affirmatively provides that no conviction "which has been . . . set aside" may be counted and therefore "creates a clear negative implication that courts may count a conviction that has not been set aside." Id. at 491. The Court also noted that Congress had enacted other statutes that expressly permit repeat offenders to challenge convictions that are used for enhancement purposes. See id. at 491-92.

Although the Court in Custis held that a

defendant could not attack collaterally the merits of the underlying conviction, the Court also held that a defendant could attack collaterally a state court conviction when the defendant had been convicted in violation of his right to counsel under the Sixth Amendment. The Court deemed such a violation akin to a "jurisdictional defect," see id. at 496, that raised questions about the court's power to render a decision at all and stated that "this Court [has] attributed a jurisdictional significance to the failure to appoint counsel," id. at 494.

"If the accused, however, is not represented by counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty. . . . The judgment of conviction pronounced by a court without jurisdiction is void, and one imprisoned thereunder may obtain release by habeas corpus."

Id. (quoting Johnson v. Zerbst, 304 U.S. 458, 468 (1938)). The Court concluded that the "failure to appoint counsel for an indigent defendant was a unique constitutional defect," and none of the other constitutional defects "rises to the level of a jurisdictional defect resulting from the failure to appoint counsel at all." Id. at 496.

Although these cases are somewhat helpful guides in deciding the case before us, their value is not the one that the Government ascribes to them. The analysis of the Supreme Court in Lewis and in Custis does not suggest that it is proper in every situation involving the use of an earlier procured judgment to refuse to allow an inquiry into the validity of that underlying judgment. To the contrary--and here we believe is the true value of Lewis and Custis to our present decision--these cases make clear that, in determining whether we should look into the validity of the underlying judgment, we must focus on the particular statutory scheme at issue and decide whether Congress expected courts to evaluate the validity of the underlying judgment. In Lewis and in Custis, the Court also made clear that we must focus on the language of the statute and the intent of Congress. See Custis, 511 U.S. at 490-92; Lewis, 445 U.S. at 60-61. In each case, the Court reached the issues that it did reach because of its interpretation of the congressional will in the particular statutory schemes. See Custis, 511 U.S. at 493; Lewis, 445 U.S. at 64-65. Repeatedly in Lewis and in Custis, the Supreme Court contrasted the firearms statutes at issue with other sections of the criminal code that permitted the sort of

collateral attack that the Court found impermissible under the statutes in those cases. It is also of great significance that, even when the Court in Custis determined that the statutory scheme did not permit the scrutiny of the merits of the underlying conviction, the Court did permit the examination of the jurisdictional basis of the underlying judgment.

3.

As we already have noted, we have no quarrel with those courts that have held that Congress did not intend that a defendant could raise the correctness of the underlying support judgment as a defense. Indeed, as we previously have pointed out, this court is among those circuits that have so held. See Black, 125 F.3d at 454. In this case, however, our focus must be on whether Congress intended to prevent the defendant from raising as a defense to his CSRA prosecution that the state court rendered the support judgment without jurisdiction. To determine whether the general rule that allows a defendant to contest a default judgment on jurisdictional grounds has been abrogated by Congress in a prosecution under the CSRA, we must focus on that particular statute and the circumstances surrounding its passage.

The issue of the enforcement of support orders has been a focal point of legislative activity at both the national and state levels. Support obligations are part of the law of domestic relations and therefore are a significant responsibility of state government. Nevertheless, because so many of these obligations transcend state borders, interstate cooperation is vital, and, in recent years, the federal government has found it necessary to play a larger role in improving the overall national situation. As we noted in Black, "Congress has expressly recognized that collecting past due child support obligations from out-of-state deadbeat parents has outgrown state enforcement mechanisms." 125 F.3d at 458.

In 1988, Congress created the U.S. Commission on Interstate Child Support ("the Commission") and charged the Commission to "submit a report to Congress that contains recommendations for (A) improving the interstate establishment and enforcement of child support awards, and (B) revising the Uniform Reciprocal Enforcement of Support Act." Family Support Act of 1988, Pub. L. No. 100-485, sec. 126, 102 Stat. 2343, 2355 (1988) (codified at 42 U.S.C. sec. 666).

The Commission submitted its report to Congress in 1992. In its report, the Commission discussed

the inefficiencies prevalent in the current system for the enforcement of interstate child support orders. See Supporting Our Children: A Blueprint for Reform, U.S. Commission on Interstate Child Support's Report to Congress xii (1992) [hereinafter Blueprint for Reform]. The Commission noted that almost $5 billion went uncollected in child support cases in 1989. See id. Moreover, the report explained, three out of every ten child support cases are interstate, yet only $1 of every $10 is collected in interstate cases. See id. Due to the poor rate of collection on interstate child support cases, the Commission sought to reform the old system of collection for a more effective one. See id.

While the Commission was conducting its study, the prevailing statute governing interstate collection of past due support obligations was the Uniform Reciprocal Enforcement of Support Act ("URESA"), which contained both civil and criminal provisions. This model act was enacted throughout the United States, although in a variety of forms. Blueprint for Reform, at 16. The differences in URESA among the states contributed to delay and inefficiency. See id. Under URESA's civil provisions, a person seeking support for a child had two options for obtaining jurisdiction over a defendant. First, the plaintiff could transmit the appropriate legal documents to the defendant's state. The defendant's state would then take action to establish or enforce the support order against the defendant. Oftentimes, multiple orders would be issued. See id. at 228-31. Or, the plaintiff's state could exert its long-arm jurisdiction over the defendant. The reach of long-arm jurisdiction varied by state, increasing the difficulties in enforcing the support orders. Although URESA addressed the need for jurisdiction over the defendant and for service of process, the Commission report explained that the requirements for jurisdiction and notice varied by state and that oftentimes the requirements of one state would not be effective in a different state. See id. at 92-93.

URESA also contained criminal provisions to facilitate the extradition of a defendant who had been charged with criminal nonsupport. See id. at 17. The uniform act required the governor of a defendant's state to surrender the defendant, unless the defendant was complying with an existing support order, the defendant had prevailed on a previous support action, or the governor believed that civil remedies would be effective. See id. This process under URESA, however, remained a "tedious, cumbersome and slow method of collection." H.R. Rep. No. 102-771, 1992 WL 187429 (1992).

When the Commission wrote its report, it discussed extensively the importance of obtaining jurisdiction over the parties. See Blueprint for Reform, at 79-85. It explained that a court or agency can establish a child support obligation only if it has authority over the person. See id. at 79. It also discussed the obligation that states give full faith and credit to the support orders of sister states. It then recommended to Congress that it "provide for the interstate recognition and enforcement of child support orders, including ongoing orders, that are based on the valid exercises of jurisdiction up to constitutionally permissible limits." Id. at 91 (emphasis added).

The Commission also discussed a new uniform act for the states to follow. Rather than merely revising URESA, the Commission advocated the implementation of the radically different Uniform Interstate Family Support Act ("UIFSA"). See id. at 231. The basic premise behind UIFSA is that "there should be one support order between parties that is controlling at any given point in time." Id. at 232. Under this proposition, only one state controls the support obligation, and once that state obtains jurisdiction, it then has continuing, exclusive jurisdiction over the parties. See id. According to the Commission, to obtain jurisdiction over the parties, UIFSA contains a new provision for long-arm jurisdiction as well as retaining the two-state process introduced in URESA. See id. The Commission recommended that, "[s]ubject to the risk of losing federal funding, states shall adopt verbatim the [ ] drafting committee's final version of UIFSA." Id. at 236. By requiring the adoption of UIFSA verbatim, the Commission hoped to avoid the difficulties that had been attendant to the myriad versions of the old uniform act that the states had enacted. See id.

Of particular importance to Mr. Kramer's case, the Commission also specifically discussed the role of service of process in interstate child support cases. The Commission noted that a support action begins with service of process to the defendant in order to perfect personal jurisdiction and to notify the defendant of the action. See id. at 92. It also explained that each affected party is entitled to receive notice and that a party who is not served properly with notice later may challenge jurisdiction. See id. Then, the Commission recommended that each state observe other states' service of process laws. See id. at 94. Also, the Commission wrote that "States shall have and use laws that provide that: . . . Notice required for the exercise of jurisdiction over an individual outside the forum

state must be given in a manner reasonably calculated to give actual notice." Id.

The language of UIFSA itself also focuses on the importance of jurisdiction in child support cases. First, to establish a support order, the act states: "Upon finding, after notice and opportunity to be heard, that an obligor owes a duty of support, the tribunal shall issue a support order directed to the obligor . . . ." UIFSA sec. 401(c). If a support order has been issued already in another state, then the receiving state "shall recognize and enforce, but may not modify, a registered order if the issuing tribunal had jurisdiction." Id. sec. 603(c) (emphasis added). Also, the receiving tribunal shall notify the defendant of the registration of the support order issued by another state. See id. sec. 605(a). Although a defendant may not plead lack of parentage as a defense to a support obligation once another tribunal has established parentage, see id. sec. 315, the defendant may contest the validity or enforcement of the support order on the grounds that "the issuing tribunal lacked personal jurisdiction over the contesting party," id. sec. 607(a)(1).

Congress acted on the recommendations of the Commission with a variety of legislative efforts. In the Full Faith and Credit for Child Support Orders Act, Pub. L. No. 103-383, sec. 3(a), 108 Stat. 4063, 4064 (1994) (codified at 28 U.S.C. sec. 1738B), Congress provided that each state "shall enforce according to its terms a child support order made consistently with this section by a court of another State." Id. sec. 3(a)(1). It further provided that

A child support order is made consistently with this section if--

(1) a court that makes the order, pursuant to the laws of the State in which the court is located--

(A) has subject matter jurisdiction to hear the matter and enter such an order; and

(B) has personal jurisdiction over the contestants; and

(2) reasonable notice and opportunity to be heard is given to the contestants.

Id. sec. 3(c), 108 Stat. at 4065. Furthermore, Congress has mandated that each state enact UIFSA or lose federal funding.

The Commission report also emphasized the importance of state criminal nonsupport statutes and recommended that all states enact them. See

Blueprint for Reform, at 178. It stressed that felony penalties should be "reserved for the especially egregious cases of nonsupport" and that "criminal enforcement is a last resort enforcement device." Id. "Civil enforcement techniques should be tried before prosecuting [a defendant] for criminal nonsupport," the Commission warned. Id. The Commission recommended that there should be a federal criminal nonsupport statute to coexist with the state criminal nonsupport statutes. See id. The Commission explained that, although a state court's criminal jurisdiction over an out-of-state defendant is not clear cut, the federal government's jurisdiction is nationwide. See id. Then, the report states, "[t]he Commission encourages Congress to pass a statute that would make it a federal crime to willfully fail to pay support." Id. at 179.

The CSRA itself started through Congress before the Commission released its final report. The Act was developed, however, in consultation with the Commission and was based on a preliminary recommendation made by the Commission. See 138 Cong. Rec. H7324-01, H7325 (daily ed. Aug. 4, 1992) (statement of then-Rep. Schumer). The House Report revealed that, in August 1992, 42 states already had made willful failure to pay child support a crime, although the ability to enforce the criminal statutes diminished significantly once the nonpaying parent crossed state lines. See H.R. Rep. No. 102-771. Representative Hyde, who spearheaded the movement for the CSRA, stated that, although URESA was necessary, it was a poor substitute for a state's internal enforcement mechanism. See 138 Cong. Rec. H7324-01, H7326 (statement of Rep. Hyde). He also stressed that the CSRA's goal was to strengthen, not supplant, state enforcement efforts. See id.

During the House debates, one of the sponsors of the bill explained that:

The bill would create a simple and straightforward criminal statute that would punish any person who willfully fails to pay a past-due support obligation to a child who resides in another State.

The bill also creates a grant program under which the Bureau of Justice Assistance may make grants to States and local entities to develop and implement this legislation and coordinate criminal interstate child support enforcement efforts.

. . . Many of our States have done their best, and they have made willful failure to pay child support a crime punishable in some States by up

to 10 years in prison. But the ability of those States to enforce such laws outside their own boundaries is hobbled by a labyrinth of extradition laws and snarls of red tape. As a result, skipping out on child support is one of the easiest crimes to get away with in America today.

Id. at H7325 (statement of then-Rep. Schumer). Another representative, Representative Schiff, stated that "existing reciprocal support statutes between States are simply bogged down and unable to perform with the efficiency we would like to see." Id. at H7326 (statement of Rep. Schiff). No mention is made of jurisdiction or the validity of the underlying state support obligation in the legislative history of the CSRA.

4.

When we scrutinize the entire legal landscape surrounding the CSRA, it is clear that this criminal provision is only a small component in a nation-wide effort to deal with the need to enforce support orders. In addressing this problem, it is clear that, as Congress legislated, it was well aware of the long-standing rule, both in federal and state jurisprudence, that a default judgment in a civil case is void if there is no personal jurisdiction over the defendant and that a judgment may be attacked collaterally on that basis. Additionally, in addressing the problem of non-payment of support orders, the Commission emphasized the importance of jurisdiction and service of process in procuring support obligations. Although the problem of enforcement of child support orders has been the focus of both national and state legislative efforts for well over a decade, there is no indication that the Commission or Congress ever intended to abrogate the traditional rule that a default judgment procured without personal jurisdiction is a nullity. More precisely, the prevailing uniform act at the time of the CSRA's passage, URESA, allowed the defendant to attack collaterally the earlier state order on jurisdictional grounds. The new order of mutually supportive federal and state legislation continued the same adherence to traditional jurisdictional standards. Notably, the new uniform act, UIFSA, also allowed a defendant to attack collaterally the earlier state order on the limited ground that it was procured without jurisdiction. The related civil statutes that Congress enacted in the wake of the Commission's report accept the general rule that a defendant may attack collaterally the underlying support order because it was procured without jurisdiction over his person. See, e.g., 28

U.S.C. sec. 1738B.

Subjecting Mr. Kramer to criminal penalties for non-compliance with the state support judgment without allowing him to challenge the state court's personal jurisdiction would permit the federal criminal law to accomplish what the states forbid in their own civil and criminal courts and, indeed, what Congress has forbidden in the civil remedies it has created. In a carefully coordinated statutory scheme that places great emphasis on federal-state cooperation, such a result makes no sense. Because the CSRA itself, its legislative history, the Commission's report, the old and new uniform acts, and the federal statutes stemming from the Commission's report contain no indication that Congress intended to alter the traditional rule that a defendant may challenge on collateral attack a default judgment that is entered without personal jurisdiction, Mr. Kramer should be able to attack the Indiana child support order that formed the basis for his federal conviction for the willful failure to pay a past due support obligation. The failure of the district court to afford him the opportunity to do so constitutes reversible error.

C.

There is another reason, firmly embedded in the statutory language, for permitting Mr. Kramer to argue that he ought not be criminally sanctioned without an opportunity to demonstrate that that judgment is a nullity because it was procured without jurisdiction. It is important to note that the statute proscribes only the willful disobedience of a state support order. Indeed, the legislative history of the statute makes clear that Congress intended that, in this statute, the term "willfully" be given the same meaning that it is given in the criminal tax statutes. See H.R. Rep. No. 102-771. Therefore, Congress, in enacting this statute, was well aware that, by using the term "willfully," the Government would be required to prove "an intentional violation of a known legal duty." Id. Indeed, quoting the Supreme Court's decision in United States v. Bishop, 412 U.S. 346, 361 (1973), the House Report noted that the word "willfully" under the tax felony statute "imports a bad purpose or evil motive." See H.R. Rep. No. 102-771.

Under traditional principles, an individual can ignore a default judgment procured without jurisdiction and raise that lack of jurisdiction when the judgment creditor attempts enforcement. Mr. Kramer was denied the right to have his jurisdictional contention ever considered by the

district court. Certainly, the maintenance of a meritorious jurisdictional defense would negate the element of willfulness./1

Conclusion

The district court erroneously held that Mr. Kramer's contention that the underlying judgment was procured without jurisdiction was not a defense to the charge. Accordingly, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion.

REVERSED and REMANDED

/1 Because Mr. Kramer contends that he has a meritorious defense on jurisdictional grounds that was never considered by the district court, it is premature, and indeed impossible on the record before us, to determine whether his position on the jurisdictional issue, even if erroneous, might have been held in good faith and therefore negated the element of willfulness necessary for criminal liability.