F I L E D
United States Court of Appeals
Tenth Circuit

APR 13 2004

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RICKIE EARL BIGFORD,

Defendant - Appellant.

No. 01-7132

Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 01-CR-29-S)

Barry L. Derryberry, Research and Writing Specialist (Paul D. Brunton, Federal Public Defender for the Eastern District of Oklahoma, and Michael A. Abel, Assistant Federal Public Defender, with him on the briefs), Tulsa, Oklahoma, for Defendant-Appellant.

Jeffrey A. Gallant, Assistant United States Attorney (Sheldon J. Sperling, United States Attorney, with him on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.

Before **SEYMOUR, EBEL** and **HENRY**, Circuit Judges.

**EBEL**, Circuit Judge.

Defendant was charged with violating the Deadbeat Parents Punishment Act

("DPPA"), 18 U.S.C. § 228, for willfully failing to pay a support obligation with respect to a child residing in another state. Defendant filed in the district court a motion to dismiss the indictment, claiming that the Oklahoma default judgment ordering him to pay child support was rendered without personal jurisdiction. The district court concluded that the DPPA does not permit a defendant to raise the invalidity of the child support order as a defense and therefore denied Defendant's motion to dismiss. Defendant entered a guilty plea conditional on his appeal of the district court's denial of his motion to dismiss. We hold that in a DPPA prosecution predicated on a default child support judgment, the defendant may challenge that judgment on the basis that personal jurisdiction was lacking. We reverse and remand to the district court for consideration of Defendant's motion challenging the jurisdictional validity of the support order issued against him.

## I. FACTS

In 1983, Rickie Earl Bigford ("Defendant") and his then wife Beverly (now Beverly Brown) separated. Ms. Brown took their minor son from their home in Burkburnett, Texas, to her hometown of Tishomingo, Oklahoma. After establishing residency, Ms. Brown sought a divorce from Defendant in Johnston County, Oklahoma. Ms. Brown's divorce lawyer represented in the affidavit for publication service before the state court "that the affiant does not know the address of the Defendant, and that the same can not with due diligence be ascertained." Ms. Brown's lawyer then perfected service

2

on Defendant in the state court proceeding through publication in Ms. Brown's local Oklahoma newspaper, the Johnston County Capital-Democrat. Defendant never appeared in the action, and in October 1984 a default judgment was entered in Johnston County decreeing the divorce and requiring Defendant to pay $150 per month in child support. Although Oklahoma law permitted Defendant to challenge a default judgment predicated upon service by publication within three years, Okla. Stat. § 2004(C)(3)(f), Defendant did not take any action regarding the judgment, either in the three year period or thereafter.

In 2001, Defendant was charged in the Eastern District of Oklahoma with violation of the Deadbeat Parents Punishment Act for "willfully and unlawfully fail[ing] to pay a support obligation." Defendant moved to dismiss the indictment on the ground that the underlying child support order was invalid for want of personal jurisdiction. The district court held an evidentiary hearing to ascertain whether Defendant would be permitted to challenge in this prosecution the child support order on the ground of lack of personal jurisdiction and, if so, whether jurisdiction was proper in Defendant's divorce and child support proceeding. Despite the statements in the affidavit for service by publication, Ms. Brown testified at the DPPA evidentiary hearing that she was "pretty sure" where Defendant was living and could be found at the time of the divorce and child support proceeding. She also testified that the judge who granted the divorce and awarded child support did so without asking whether Defendant had been notified of the proceedings.

In considering Defendant's motion, the district court first concluded that the DPPA itself does not permit an attack on the validity of the underlying child support order. The

3

court then considered United States v. Mendoza-Lopez, in which the Supreme Court provided aliens charged with illegal entry a limited opportunity to attack their previous deportation proceedings when defects in those proceedings deprived the aliens of an opportunity for judicial review. 481 U.S. 828, 837-38 (1987). The district court concluded, however, that because Oklahoma law permitted Defendant to challenge the default judgment for three years after its entry, Defendant had an opportunity for judicial review of the underlying default support order and was therefore barred from invoking Mendoza-Lopez.

Defendant then entered a guilty plea conditional on the outcome of this appeal. He appeals on the ground that he should have been permitted to challenge the Oklahoma default judgment on the basis of personal jurisdiction, both under the United States Constitution and under Oklahoma state law. We hold that Defendant is entitled to assert this jurisdictional defense in the DPPA prosecution action against him.

## II.  DISCUSSION

### A.  The Deadbeat Parents Punishment Act

The Deadbeat Parents Punishment Act of 1998 ("DPPA")[1] criminalizes the willful

---

[1]The DPPA superseded the Child Support Recovery Act of 1992 ("CSRA"). The operative language did not change. Both criminalize the willful failure to pay a "support obligation" with respect to a child who resides in another state, and both define "support obligation" as "any amount determined under a court order or an order of an administrative process pursuant to the law of a State." 18 U.S.C. § 228(a), (f)(3) & hist. & stat. notes. Defendant in this case was charged exclusively under the DPPA, as the indictment cites acts occurring "on or about June 24, 1998," the effective date of the DPPA. In the interest of simplicity, we will refer to the statute throughout this opinion as

failure to pay a support obligation with respect to a child who resides in another state. 18

U.S.C. § 228(a). The Act was proposed in an effort to reduce the $5 billion annual deficit

in child support obligations by attaching criminal penalties to nonpayment. See H.R.

Rep. No. 102-771, at 5-6 (1992) (discussing H.R. 1241, the bill that would become the

CSRA). Specifically, under the DPPA:

> Any person who (1) willfully fails to pay a support obligation with respect
> to a child who resides in another State, if such obligation has remained
> unpaid for a period longer than 1 year, or is greater than $5,000...[or]
> (3)...has remained unpaid for a period longer than 2 years, or is greater than
> $10,000; shall be punished as provided in subsection (c).

18 U.S.C. § 228(a). Subsections (c) and (d) provide for punishment of imprisonment up

to 2 years and restitution in an amount equal to the total unpaid support obligation,

depending on the nature of the violation. Id. § 228(c), (d). The DPPA defines a "support

obligation" as:

> [A]ny amount determined under a court order or an order of an
> administrative process pursuant to the law of a State or of an Indian tribe to
> be due from a person for the support and maintenance of a child or of a
> child and the parent with whom the child is living.

Id. § 228(f)(3).

Decisions from other circuits have unanimously held that the DPPA (and the

CSRA) does not permit an attack on the *substantive* lawfulness of the underlying state

support obligation or permit a federal court to revise the order in any way. See United

States v. Molak, 276 F.3d 45, 50-51 (1st Cir. 2002); United States v. Faasse, 265 F.3d

---

the DPPA, although much of the precedent we cite construed the CSRA.

5

475, 488 n.11 (6th Cir. 2001); United States v. Kramer, 225 F.3d 847, 851 (7th Cir. 2000); United States v. Craig, 181 F.3d 1124, 1128 (9th Cir. 1999); United States v. Brand, 163 F.3d 1268, 1275-76 (11th Cir. 1998); United States v. Black, 125 F.3d 454, 463 (7th Cir. 1997); United States v. Bailey, 115 F.3d 1222, 1232 (5th Cir. 1997); United States v. Bongiorno, 106 F.3d 1027, 1033-34 (1st Cir. 1997); United States v. Johnson, 114 F.3d 476, 481 (4th Cir. 1997); United States v. Sage, 92 F.3d 101, 107 (2d Cir. 1996).

However, only one of these courts has specifically considered whether the DPPA permits inquiry into the *jurisdictional* validity of the underlying support obligation. In United States v. Kramer, the Seventh Circuit held that the DPPA permits a defendant in a DPPA prosecution to challenge the personal jurisdiction of the state court that issued the underlying child support order. 225 F.3d at 857. The court in Kramer based its holding on the general rule that default judgments that are void for want of jurisdiction can be attacked on that basis and that nothing in the DPPA or its legislative history negated that general rule. See id. at 851-57 (citing Burnham v. Super. Ct. of Cal., 495 U.S. 604, 609-11 (1990)). It discussed extensively the federal legislative scheme of which the DPPA is a part, concluding that the jurisdictional requirement included in related statutes supported a conclusion that Congress intended to permit limited jurisdictional attacks of underlying default support orders in DPPA prosecutions. See id. at 853-57. We agree with the Seventh Circuit's decision in Kramer.

## B. General Rule: Default Judgments Rendered Without Jurisdiction Are Subject to Collateral Attack

Like the court in <u>Kramer</u>, our inquiry into the permissibility of challenges to the underlying support order on the basis of lack of personal jurisdiction begins with the longstanding proposition that judgments rendered by a court lacking jurisdiction are void. <u>Burnham v. Super. Ct. of Cal.</u>, 495 U.S. 604, 608 (1990); <u>see also</u> <u>Williams v. Life Sav. & Loan</u>, 802 F.2d 1200, 1202 (10th Cir. 1986). "Traditionally [this] proposition was embodied in the phrase *coram non judice*, 'before a person not a judge' – meaning, in effect, that the proceeding in question was not a *judicial* proceeding because lawful judicial authority was not present, and could therefore not yield a *judgment*." <u>Burnham</u>, 495 U.S. at 608 (emphasis in original).

A judgment may therefore be attacked in a collateral proceeding in another jurisdiction on the basis that it was rendered without jurisdiction.[2] <u>Durfee v. Duke</u>, 375 U.S. 106, 110 (1963); <u>Pennoyer v. Neff</u>, 95 U.S. 714, 730-33 (1877), *overruled on other grounds by* <u>Shaffer v. Heitner</u>, 433 U.S. 186 (1977); <u>Thompson v. Whitman</u>, 85 U.S. 457, 469 (1873); <u>see also</u> <u>Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 706 (1982) ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding."); <u>United States v. Thompson</u>, 941 F.2d 1074, 1080 (10th Cir.

---

[2]Indeed, the Full Faith and Credit for Child Support Orders Act ("FFCCSOA") expressly provides that a state need not enforce a child support order rendered by another state unless it was rendered with both subject matter and personal jurisdiction. 28 U.S.C. § 1738B(c).

7

1991) ("Only void judgments are subject to collateral attack."); <u>First Nat'l Bank & Trust Co. of Wyo. v. Lawing</u>, 731 F.2d 680, 684 (10th Cir. 1984) (quoting <u>Ins. Corp. of Ireland</u>, 456 U.S. at 706); <u>V.T.A., Inc. v. Airco, Inc.</u>, 597 F.2d 220, 224 n.9 (10th Cir. 1979) ("[I]f a judgment is void, it is a nullity from the outset."); <u>United States v. Indoor Cultivation Equip. From High Tech Indoor Garden Supply</u>, 55 F.3d 1311, 1317 (7th Cir. 1995) ("[V]oid judgments are legal nullities[.]"); <u>Rodd v. Region Constr. Co.</u>, 783 F.2d 89, 91 (7th Cir. 1986) ("[A] void judgment is no judgment at all."); <u>Jones v. Giles</u>, 741 F.2d 245, 248 (9th Cir. 1984) ("A void judgment, as opposed to an erroneous one, is legally ineffective from inception."); <u>Jordan v. Gilligan</u>, 500 F.2d 701, 704 (6th Cir. 1974) ("A void judgment is a legal nullity[.]").

Of course, a collateral attack on jurisdictional grounds is precluded in a subsequent proceeding where the jurisdictional issue was "fully and fairly litigated and finally decided" in the prior proceeding. <u>Durfee</u>, 375 U.S. at 111; <u>see also</u> <u>First Nat'l Bank</u>, 731 F.2d at 684. Indeed, as long as a party had an opportunity to litigate the jurisdictional issue, it is not subject to collateral attack on that basis. <u>Ins. Corp. of Ireland</u>, 456 U.S. at 702 n.9. Thus, the rule that judgments rendered without jurisdiction are void and subject to collateral attack is a rule invoked in the context of a collateral challenge to a default judgment entered after the defendant has failed to appear. <u>See</u> <u>Kramer</u>, 225 F.3d at 857 (stating rule that "a *default* judgment in a civil case is void if there is no personal jurisdiction over the defendant" (emphasis added)).

Personal jurisdiction traditionally consists of two distinct components. First, the

exercise of jurisdiction must be consistent with the state's jurisdictional requirements, and, second, the exercise of jurisdiction must be consistent with the Due Process Clause of the United States Constitution. Am. Steel Bldg. Co. v. Davidson & Richardson Constr. Co., 847 F.2d 1519, 1521 (11th Cir. 1988). There are several potential differences between a collateral challenge based on state procedural law of personal jurisdiction and one based on federal constitutional law of personal jurisdiction, as discussed below.

### 1. Basis of the Rule

The general rule that default judgments rendered without jurisdiction are subject to collateral attack was followed as a common law principle long before the Fourteenth Amendment was adopted. Burnham, 495 U.S. at 608-09. However, in 1877 the Supreme Court in Pennoyer v. Neff, 95 U.S. 714 (1877), reaffirmed at least part of the rule as one mandated by the Due Process Clause of the Fourteenth Amendment. See Burnham, 495 U.S. at 608-09 (suggesting that rule that judgment of court lacking jurisdiction is void has evolved from "common-law principle" of "English Year Books" to constitutional mandate, per Pennoyer, 95 U.S. at 732). In Pennoyer, the Supreme Court held:

> Since the adoption of the Fourteenth Amendment to the Federal Constitution, the validity of such judgments may be directly questioned, and their enforcement in the State resisted, on the ground that proceedings in a court of justice to determine the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law.

95 U.S. at 733. The Court in Pennoyer reasoned that a judgment obtained without personal jurisdiction is "void," is "an absolute nullity," "has no binding force without the

9

State," and "is not entitled to any respect in the State where rendered." 95 U.S. at 732.

The modern iteration of this constitutional rule is that "a judgment rendered in violation of due process is void in the rendering state and not entitled to full faith and credit elsewhere."[3] World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980) (citing Pennoyer, 95 U.S. at 732-33). With respect to a state court's power to render a valid personal judgment against a nonresident defendant, "due process" requires "that the defendant be given adequate notice of the suit," per Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313-14 (1950), and "be subject to the personal jurisdiction of the court" per International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). World-Wide Volkswagen, 444 U.S. at 291.

Thus, a defendant against whom a default judgment has been entered has a due process right to launch a collateral attack of that judgment in another jurisdiction on the basis that it was rendered in violation of Fourteenth Amendment jurisdictional principles. A statute that prohibits the exercise of that right would therefore pose a serious danger of unconstitutionality. In contrast, the defendant's ability to attack the judgment on the basis of *state* jurisdictional rules remains a principle of the common law.

---

[3]Under the United States Constitution, "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, § 1. Under the Full Faith and Credit Act, "[The] Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738.

## 2. Limitations on the Challenge: State Absolute Verity Rules

Some states such as Oklahoma, while recognizing that a default judgment rendered without personal jurisdiction is void and subject to collateral challenge, limit the scope of that collateral challenge to the face of the record or judgment roll. Pursuant to such "absolute verity" rules, if the jurisdictional defect does not appear on the face of the judgment roll or record, the judgment is considered valid and therefore immune from collateral attack.[4] See, e.g., Vance v. Fed. Nat'l Mortgage Ass'n, 988 P.2d 1275, 1279 (Okla. 1999) ("Because the irregularity in service...can only be proved by evidence outside the judgment roll, the challenged judgment is not void (in the legal sense) for lack of jurisdiction but at best is voidable for want of due process" (emphasis omitted).).

In an enforcement action in another jurisdiction, a collateral challenge based purely on the rendering state's jurisdictional requirements, and not on constitutional due process concepts, is limited by the rendering state's absolute verity rule. A.L.T. Corp. v. Small Bus. Admin., 801 F.2d 1451, 1456-57 (5th Cir. 1986) (in context of action in federal court to enforce Texas judgment, applying Texas absolute verity rule to Texas service of process issue); see also Restatement (Second) of Conflicts § 92 cmt. j., § 105 cmt. b. (1971) (stating that rendering state rules regarding attack of judgments are controlling as to state jurisdictional requirements).

---

[4]This appears to be the minority rule, as many states recognize that a judgment may be impeached by evidence that contradicts the record. See Restatement (Second) of Judgments § 77 & cmts. & Rptr.'s Note (stating that "[t]he modern rule is that a judgment may be impeached by evidence that contradicts the record in the action").

Accordingly, we have applied the rendering state's absolute verity rule when considering, in the context of a collateral challenge, whether the state judgment was jurisdictionally valid under the procedures of the rendering state. See Fransen v. Conoco, Inc., 64 F.3d 1481, 1493-94 (10th Cir. 1995) (Oklahoma law); Houghton v. Foremost Fin. Servs. Corp., 724 F.2d 112, 116 n.4 (10th Cir. 1983) (Oklahoma law); Pan Am. Petroleum Corp. v. Candelaria, 403 F.2d 351, 353 (10th Cir. 1968) (New Mexico law); Clay v. Sun River Mining Co., 302 F.2d 599, 601 (10th Cir. 1962) (Oklahoma law); Johnson v. First Nat'l Bank in Wichita, 223 F.2d 31, 33 (10th Cir. 1955) (Kansas law); Merrell v. United States, 140 F.2d 602, 606-07 (10th Cir. 1944) (Oklahoma law).[5,6]

However, an absolute verity rule applicable in the rendering state does not preclude a court in another jurisdiction from considering evidence extrinsic to the record in a collateral challenge based on Fourteenth Amendment principles of personal jurisdiction. As previously noted, a defendant against whom a default judgment has been entered has a due process right to launch a collateral attack of that judgment in another jurisdiction on the basis that it was rendered in violation of Fourteenth Amendment jurisdictional principles. See discussion supra Section II.B.1. It follows that a state may

---

[5]The application of the state absolute verity rule in several of these cases is dicta because the court held that the judgment was void on its face. See Pan Am. Petroleum, 403 F.2d at 352-53; Clay, 302 F.2d at 602.

[6]In Springer v. Townsend, we applied a state absolute verity rule when considering jurisdictional requirements pursuant to a federal statute. 336 F.2d 397, 400-401 (10th Cir. 1964). Springer turned on a specific provision in the statute that limited jurisdictional attacks to the face of the order. See id. at 401 & n.9.

not eviscerate that constitutional right with a domestic absolute verity rule. See

Thompson v. Whitman, 85 U.S. 457, 468-69 (1873) (holding, in context of challenge to

adequacy of notice, that absolute verity rules have "no extra-territorial force" and that

"the jurisdiction of the court by which a judgment is rendered in any State may be

questioned in a collateral proceeding in another State...notwithstanding the averments

contained in the record of the judgment itself").

Further, the Full Faith and Credit Clause and the Full Faith and Credit Act were

not designed to give the rendering state control over federal principles of personal

jurisdiction when that order is challenged in a foreign jurisdiction. See Williams v. North

Carolina, 325 U.S. 226, 233-34 (1945) (holding that to accord absolute verity to

jurisdictional recitations "would give one State a control over all the other States which

the Full Faith and Credit Clause certainly did not confer"). A state's absolute verity rule

therefore has no force when, in the context of an enforcement action in another

jurisdiction, a judgment from the original state is challenged on the basis of Fourteenth

Amendment principles of personal jurisdiction.[7]

### C. Is the DPPA Consistent With the General Rule?

Admittedly, the foregoing principles were developed in the context of an

---

[7]This principle extends not only to collateral challenges in the courts of other states but also to collateral challenges in a federal court sitting in the same state as the rendering state court. Cooper v. Newell, 173 U.S. 555, 566-67 (1899); see also Wright et al., Federal Practice & Procedure § 4469, at 79-81 (2d ed. 2002) ("A federal court is as free as state courts...to deny enforcement if the state court lacked subject-matter jurisdiction or personal jurisdiction.").

enforcement action brought in another jurisdiction. This is not precisely the issue presented in this case because a criminal proceeding under the DPPA is not technically an action brought to enforce the state child support order. It is a criminal proceeding, the result of which will neither directly enforce the state support order nor declare it unenforceable. See discussion infra Section II.E. However, the principles articulated above are nevertheless relevant because it cannot be gainsaid that the purpose of the DPPA is to enhance compliance with state support orders by providing federal criminal penalties for non-compliance.

The DPPA, in fact, requires as an element of the offense a "support obligation," defined as an "amount determined under a court order...pursuant to the law of a State." 18 U.S.C. § 228(f)(3). Thus, where the child support order underlying the DPPA prosecution was rendered by default, application of the general common law and constitutional rule would appear to permit a defendant to assert in the DPPA prosecution that no underlying "court order" or "support obligation" existed because it was rendered without personal jurisdiction over the defendant and was therefore void.

The statutory language, the limited legislative history, and the overall legislative scheme all support a conclusion that Congress did not intend to deviate from the general rule that would permit a defendant in a DPPA criminal proceeding to challenge an underlying default support order on the basis that personal jurisdiction over the defendant in the support proceeding was lacking.

14

## 1. Statutory Language

Turning first to the statutory language, the DPPA defines a "support obligation" as:

> [A]ny amount determined under a *court order* or an order of an administrative process *pursuant to the law of a State* or of an Indian tribe to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living.

Id. § 228(f)(3) (emphasis added). The statutory language, "court order...pursuant to the law of the State," suggests that the underlying child support order be lawful before it can serve as an element of the federal crime of willful failure to pay a child support obligation. See United States v. Lewis, 936 F. Supp. 1093, 1103 (D.R.I. 1996).

The Supreme Court has discussed fairly analogous language in a federal statute that criminalized reentry after deportation. See Mendoza-Lopez, 481 U.S. at 835-36. In considering whether a defendant charged with reentry after deportation could challenge the merits of the underlying deportation proceedings, the Supreme Court distinguished the language of the current reentry statute from a prior, superseded statute to conclude that the language of the current statute did not permit a collateral attack. Id. The previous version of the statute referred to any alien who had been "deported in pursuance of law," while the current reentry statute contained no such language. Id. The Supreme Court stated that the "in pursuance of law" language was "express language that would have permitted collateral challenges to the validity of deportation proceedings in a criminal prosecution for reentry after deportation." Id. at 836. The language used in the

immigration statute, "in pursuance of law," is similar to the DPPA's language, "pursuant to the law of a State." Although the DPPA language is more limited than the language of the reentry statute, both clauses clearly suggest some requirement that the underlying proceeding have been lawful before federal criminal sanctions may attach.

This statutory language, however, does not permit *all* challenges to the underlying support order. Most importantly, the circuit courts that have considered the issue have unanimously held that the DPPA does not permit an attack of the *substantive* lawfulness of the underlying support obligation or permit a federal court to revise the order in any way. See discussion supra Section II.A. We agree. There is a strong common law presumption that the federal government should not become involved in determinations of substantive issues of family law. See Moore v. Sims, 442 U.S. 415, 435 (1979) ("Family relations are a traditional area of state concern."); Morrow v. Winslow, 94 F.3d 1386, 1397 (10th Cir. 1996) (quoting Moore, 442 U.S. at 435); Dubroff v. Dubroff, 833 F.2d 557, 561 (5th Cir. 1987) ("[T]here is perhaps no state administrative scheme in which federal court intrusions are less appropriate than domestic relations law."). To overcome this strong common law tradition against federal review of substantive state domestic law decrees, we would require a substantially more explicit statement from Congress that issues of substantive family law could be considered in DPPA prosecutions before we would entertain such an attack. Several courts have based their decision that the DPPA or CSRA is constitutional under federalism and Tenth Amendment requirements in part on their conclusion that the statute does not permit re-litigation of

16

substantive issues traditionally left to the resolution of the states.  See, e.g., Bailey, 115 F.3d at 1232 (federalism); Bongiorno, 106 F.3d at 1033-34 (Tenth Amendment); Johnson, 114 F.3d at 481 (Tenth Amendment); Sage, 92 F.3d at 107 (Tenth Amendment).

Nonetheless, the statute does require that the underlying child support order be determined "pursuant to the law of a State."  18 U.S.C. § 228(f)(3).  Because we must give operative effect where possible to all statutory terms, United States v. Nordic Village, Inc., 503 U.S. 30, 36 (1992), we conclude that this language does, at a minimum, affirm the general common law and constitutional rule permitting collateral challenges based on *jurisdictional* law.

Moreover, we do not interpret the language, "pursuant to the law of a State," as evidence of Congressional intent only to allow challenges based on state procedural law of personal jurisdiction and to preclude challenges based on constitutional law of personal jurisdiction.  Congress must have intended that the state law pursuant to which the judgment was rendered be constitutional.  As previously noted, a defendant has a due process right to challenge a default judgment in another jurisdiction on the basis that it was rendered in violation of Fourteenth Amendment jurisdictional principles, rendering such judgment void and therefore not pursuant to any law.  Certainly Congress did not mean to abandon this bedrock concern of our law.  See Ohio v. Akron Ctr. for Reproductive Health, 497 U.S. 502, 514 (1990) ("Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality" (internal quotations omitted).); cf. Custis v. United States, 511 U.S. 485, 493-94 (1994) (recognizing that even though

17

Armed Career Criminal Act does not permit collateral challenges to underlying state conviction, Constitution requires limited collateral challenge on basis that underlying conviction was entered without assistance of counsel).

### 2. Legislative History and Scheme

The legislative history of the CSRA is sparse. In 1988, Congress created the U.S. Commission on Interstate Child Support ("Commission") to submit recommendations for improving the interstate establishment and enforcement of child support awards. Family Support Act of 1988, Pub. L. No. 100-485, § 126, 102 Stat. 2343 (1988) (codified at 42 U.S.C. § 666). In 1992 the Commission submitted its report, Supporting Our Children: A Blueprint for Reform ("Blueprint"). Although the Commission's final report was not available at the time Congress began considering the CSRA, the Act was based on preliminary recommendations of the Commission. See 138 Cong. Rec. H7324-01, H7325 (daily ed. Aug. 4, 1992) (statement of then-Rep. Schumer).

In its report, the Commission recommended, inter alia, that Congress pass federal legislation criminalizing the willful nonpayment of child support. Blueprint at 179. The Commission emphasized the importance of obtaining jurisdiction over nonresident defendants in child support actions. Id. at 79. According to the Commission, "The genesis of a child support case is jurisdiction. A tribunal (court or agency) can establish parentage or a child support obligation only if it has authority over the person." Id. Although the Commission's recommendations do not carry the force of a Congressional committee report, the recommendations are consistent with our conclusion that the DPPA

18

recognizes and attaches criminal sanctions only to those child support obligations rendered by a court with jurisdiction over the defendant.

Moreover, "[w]e construe a statutory term so that it 'fits most logically and comfortably into the body of both previously and subsequently enacted law.'" Utah v. Babbitt, 53 F.3d 1145, 1149 (10th Cir. 1995) (quoting W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 100-01 (1991)). The DPPA is only one part of a scheme of federal legislation designed to assist in the interstate enforcement of child support orders. In 1994, Congress passed the Full Faith and Credit for Child Support Orders Act ("FFCCSOA"). 28 U.S.C. § 1738B. The FFCCSOA requires states to "enforce according to its terms a child support order made consistently with this section by a court of another State." Id. § 1738B(a)(1). An order is made "consistently with this section" if, inter alia, the issuing court has "personal jurisdiction over the contestants" and if reasonable notice and opportunity to be heard is given to the contestants. See id. § 1738B(c).

In addition to the FFCCSOA, Congress has conditioned federal funding on a state's passage of the Uniform Interstate Family Support Act ("UIFSA"). See 42 U.S.C. § 666(f). The UIFSA provides that a state asked to enforce another state's child support order "shall recognize and enforce, but may not modify, a registered order if the issuing tribunal had jurisdiction." See, e.g., Okla. Stat. tit. 43, § 601-603(C). The UIFSA therefore suggests that a defendant who has not already litigated the issue may contest the validity of the support order on the ground that the rendering court lacked jurisdiction.

19

See id.

Considering this statutory scheme, it seems unlikely that Congress would intend to depart so drastically in the DPPA from the requirements of personal jurisdiction that is imposed by the other federal child support enforcement and recognition statutes. It would seem inconsistent that a defendant could be criminally prosecuted under the DPPA for failure to pay a child support order that may not be enforceable under the aforementioned civil legislation. Kramer, 225 F.3d at 857. Although Congressional inclusion of explicit jurisdictional requirements in each of these various civil enforcement statutes may suggest that Congress knew how to include an explicit jurisdictional requirement if it chose to do so, see Lewis v. United States, 445 U.S. 55, 61-62 (1980), for several reasons we decline to read so much into the failure of Congress to provide explicitly for jurisdictional challenges in the DPPA.

First, the DPPA fits more comfortably into the overall statutory scheme of federal child support enforcement if construed to permit challenges to personal jurisdiction of the underlying support order. See Babbitt, 53 F.3d at 1149. Second, although the DPPA does not explicitly mention jurisdiction, it has spoken at least indirectly to the issue by requiring that the support order be issued "pursuant to the law of a State," which we construe to include constitutional jurisdictional requirements. Finally, we construe statutes to avoid a danger of unconstitutionality, Akron Center, 497 U.S. at 514, and prohibiting federal courts in DPPA prosecutions from entertaining any challenge to the

20

underlying support order based on personal jurisdiction creates a serious danger of unconstitutionality, see discussion supra Section II.B.1.

In sum, the statutory language, "pursuant to the law of a State," the legislative history of the Act, and the overall legislative scheme support the conclusion that the DPPA is consistent with the general rule that default judgments rendered without jurisdiction over the defendant are subject to collateral attack in another jurisdiction. We therefore hold that the DPPA allows a defendant to challenge a default child support order on the basis that the state court that rendered the judgment lacked personal jurisdiction over the defendant.[8,9] Permitting such challenges will facilitate the operation

---

[8]In United States v. Mayfield, we held that a defendant charged with violating the federal felon-in-possession statute could not launch a collateral attack to the state conviction in his federal prosecution. 810 F.2d 943, 946-47 (10th Cir. 1987). The defendant in Mayfield alleged that he should have been tried as a juvenile under state statutory law and that the state court that convicted him therefore lacked jurisdiction over him. See id. at 944. Mayfield is distinguishable from the instant case. Mayfield, relying on Lewis v. United States, 445 U.S. 55 (1980), held that the federal felon-in-possession statute effectively abrogated the general rule that judgments rendered without jurisdiction are void. See Mayfield, 810 F.2d at 946 (recognizing that "for most purposes the law ignores a void conviction").

[9]Defendant argues that United States v. Mendoza-Lopez, 481 U.S. 828, 837-38 (1987), permits a collateral attack on the basis of personal jurisdiction. Mendoza-Lopez provided aliens charged with illegal entry a limited opportunity to attack collaterally their prior administrative deportation proceedings when defects in those proceedings deprived the aliens of an opportunity for judicial review. Id. Even if Mendoza-Lopez could be extended from the context of an underlying *administrative* proceeding to the context of an underlying *judicial* proceeding, Mendoza-Lopez is invoked only after concluding that the statute itself precludes collateral challenges. See id. at 837. Given our resolution of this case, we need not address Defendant's Mendoza-Lopez argument.

21

of this important statute.[10]

## D.  Burden of Proof

The defendant in a DPPA prosecution will bear the burden to prove a lack of personal jurisdiction in the underlying state support proceeding.  In Morrison v. California, the Supreme Court held:

> The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant.  The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression.

291 U.S. 82, 88-89 (1934).  By introducing a state support order, the government has "proved enough to make it just for the defendant to be required to repel what has been proved."  See id.  Also, a defendant in a DPPA prosecution is the party most able to present evidence that jurisdiction in the underlying state action was lacking (for example, as in this case, evidence of an ex-spouse's knowledge of the defendant's whereabouts and lack of due diligence in locating the defendant).  As such, "upon a balancing of convenience or of the opportunities for knowledge," see id., it is appropriate to shift the

_____

[10]Having construed the DPPA to permit such challenges, the Act presents no constitutional infirmity.  We emphasize that we have grave doubts as to whether the Constitution would allow a federal statute to criminalize the failure to comply with a court order that was rendered without personal jurisdiction over the defendant.  See discussion supra Section II.B.1.

burden to the defendant to prove a claim that personal jurisdiction was lacking.

## E. Non-Interference with Civil Enforceability of Support Order

Congress intended the DPPA to serve as a mechanism for punishing parents who did not pay child support obligations and encouraging those parents to pay those obligations; it did not intend to provide deadbeat parents an additional mechanism with which to challenge the validity of the child support orders that had been issued against them. See discussion supra Section II.A. Our construction of the DPPA is consistent with this Congressional intent.

Our construction provides deadbeat parents no additional mechanism with which to avoid the judgments entered against them, because a federal court's ruling in the DPPA defendant's favor on the jurisdictional issue will have no force in a subsequent civil enforcement action brought by the parent who initially obtained the support order. Collateral estoppel, or issue preclusion, can only be invoked against a party who had a full and fair opportunity to litigate the issue, Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation, 975 F.2d 683, 687 (10th Cir. 1992) (requiring, as a prerequisite to the application of collateral estoppel, that "the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication"), and the parent who initially obtained the child support order is not a party to the DPPA prosecution.

Thus, a parent who successfully defends against a DPPA prosecution on the basis that personal jurisdiction of the underlying support order was lacking must relitigate the

jurisdictional issue in any subsequent enforcement action brought by the parent who initially obtained the support order. Allowing federal courts to entertain jurisdictional challenges to the underlying state support order for purposes of defending against a DPPA criminal prosecution will not impair the ability of the parent who subsequently attempts to enforce the judgment to do just that.

## III. CONCLUSION

We hold that a defendant in a DPPA prosecution may challenge an underlying default support order on the basis that the state court that issued the order lacked personal jurisdiction over the defendant. On remand, Defendant will bear the burden to prove that the Oklahoma support order was rendered without personal jurisdiction under the requirements of the Due Process Clause of the Fourteenth Amendment or under Oklahoma long-arm jurisdictional requirements, and Oklahoma's absolute verity rule will apply only to the state procedural challenge and not to the Fourteenth Amendment challenge.[11]

We REVERSE the judgment of the district court denying Defendant's motion to dismiss and REMAND to the district court for further proceedings consistent with this opinion.

---

[11]Because Oklahoma's long-arm statute authorizes jurisdiction coextensive with the Due Process Clause, Williams v. Bowman Livestock Equip. Co., 927 F.2d 1128, 1131 & n.3 (10th Cir. 1991); Okla. Stat. tit. 12, § 2004(F), any attack based on Oklahoma's jurisdictional requirements would appear to be encompassed by Defendant's challenge under the Fourteenth Amendment.